-

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **RUSSELL LAWSON, JR.;** | : | |
| **BRIAN BURNS;** | : | |
| **CHRISTOPHER PENTA;** | : | **COMPLAINT** |
| **SECOND AMENDMENT FOUNDATION, INC.;** | : | |
| **and GUN OWNERS' ACTION LEAGUE,** | : | 42 U.S.C. § 1983 |
| | : | |
| Plaintiffs | : | CIVIL ACTION NO. |
| | : | _____ |
| | : | |
| **v.** | : | |
| | : | |
| **ANDREA JOY CAMPBELL,** in her official | : | |
| capacity as Attorney General of the Commonwealth | : | |
| of Massachusetts; | : | |
| **TERRENCE M. REIDY,** in his official capacity | : | |
| as Secretary of the Executive Office of Public | : | |
| Safety and Security of the Commonwealth of | : | |
| Massachusetts; | : | |
| **GEOFFREY D. NOBLE,** in his official capacity as | : | |
| Superintendent of the Massachusetts State Police; | : | |
| and | : | |
| **JAMISON R. GAGNON,** in his official capacity as | : | |
| Commissioner of the Massachusetts Department of | : | |
| Criminal Justice Information Services, | : | |
| | : | |
| Defendants. | : | |
| | : | |

---

Come now Plaintiffs Russell Lawson, Jr., Brian Burns, and Christopher Penta ("Individual Plaintiffs"), along with Second Amendment Foundation, Inc., and Gun Owners' Action League (collectively "Plaintiffs"), and allege against the Defendants named herein as follows:

### INTRODUCTION

1.      The plaintiffs in this case include three individuals and numerous similarly-situated members and supporters of the Institutional Plaintiffs who are law-abiding adult residents of states other than Massachusetts but who regularly travel to and abide in the Commonwealth for legitimate personal and business

reasons. All of them are responsible gunowners who possess, use, and carry firearms in their home states for self-defense and other lawful purposes, in particular semiautomatic firearms and handguns—"the quintessential self-defense weapon" in America, *District of Columbia v. Heller*, 554 U.S. 570, 629, (2008). All of them simply seek to do the same while in Massachusetts, as the right to keep and bear arms under Second Amendment to the United States Constitution guarantees they are entitled to do. The Second and Fourteenth Amendments squarely protect the right of "ordinary, law-abiding citizens" like the plaintiffs here to not only "possess a handgun in the home for self-defense" but also "to carry handguns publicly for their self-defense." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 9-10 (2022).

2.     The Commonwealth, however, erects a barrier to the exercise of this right by non-residents anywhere within its borders: all ordinary, law-abiding citizens of other states must obtain a "license to carry" ("LTC") in order to *lawfully* engage in this activity, and even then, this is merely a "temporary" pass only good for a year— far shorter in duration than the six-year period of validity for resident LTCs.

3.     All of these plaintiffs, being the law-abiding citizens they are, have sought to comply with all the requirements necessary to obtain and maintain this licensure so they can lawfully exercise their right to keep and bear arms while in Massachusetts: Plaintiff Russell Lawson is a first-time applicant seeking to obtain such a license in the first instance so he can finally begin to exercise this fundamental liberty while inside the confines of the Commonwealth without being subject to arrest; and Plaintiffs Brian Burns and Christopher Penta obtained a temporary non-resident LTC several years ago and have since been attempting to consistently maintain the license through the renewal process so to remain free from the risk of arrest and prosecution for simply exercising their constitutional rights.

4.     Yet, all of them are trapped in the same vicious cycle of inordinate delays in the licensing process, forcing first-time applicants to park their Second Amendment rights at the border for months on end before they can lawfully keep and bear arms within the Commonwealth and then, after their LTC is finally issued, trapping them in legal purgatory each year as they must subsist with an expired

2

licensed for weeks or months as they await approval of their "renewal" applications. Unlike the full-fledged LTCs only made available to residents, no grace periods exist for the temporary LTCs to which non-residents are relegated. So, every day after expiration and before renewal is a day that it is illegal for them to engage in any of the otherwise constitutionally protected firearm activities—as if they had no license at all.

5.    And there is no recourse, as the applicant is simply left to languish at the mercy of the Commonwealth's failure or refusal to process LTC applications within a reasonable period of time—consistently and egregiously falling well short of even its own statutory standards for application processing time periods.

6.    This case serves as a stark illustration of that vicious cycle: In the case of Plaintiff Lawson, the first-time applicant, his application was almost immediately sidelined for more than four months *before* he was even  scheduled for the "in-person" interview required as part of the process—which is particularly difficult for him and many other residents of distant states because the interview can only be satisfied by appearing at the Firearms Record Bureau (FRB) in Chelsea, Massachusetts. All the while, Plaintiff Lawson and the numerous similarly-situated first-time applicant members of the Institutional Plaintiffs remain under the state-imposed disability against the exercise of their right to keep and bear arms anywhere within the Commonwealth.

7.    Further, absent the relief being sought through this action, even if Plaintiff Lawson eventually obtains a temporary LTC, he will inevitably be swept up in the cycle of delays leading to lapses in licensure—and thus effectively no licensure at all—as he attempts to maintain the license through the chaotic yearly renewal process mandated for non-resident LTC holders.

8.    That is precisely what has happened with Plaintiffs Burns and Penta who hold temporary non-resident LTCs and have repeatedly struggled to maintain their licensure ever since obtaining it. Despite their good faith efforts in timely and properly submitting their renewal applications with generous lead time before the expiration date, their applications have been excessively and unreasonably delayed,

resulting in significant lapses between the expiration date and renewal date. Consequently, they have been trapped in legal purgatory for weeks or months at a time. Numerous other similarly situated members of the Institutional Plaintiffs have encountered the same fate in attempting to maintain the licensure mandated to lawfully keep and bear arms in the Commonwealth.

9.      Through this action, Plaintiffs will demonstrate that the Commonwealth's licensing scheme, as enforced by the named Defendants, violates the fundamental constitutional rights of all such individuals: foremost, the Second Amendment right to keep and bear arms, but also their rights to equal protection and to the privileges and immunities that must be afforded all Americans under the Constitution.

10.     The declaratory and injunctive relief that Plaintiffs seek here is necessary to prevent any further constitutional violations and to ensure that law-abiding Americans like Individual Plaintiffs and the similarly situated members of Institutional Plaintiffs are afforded these fundamental constitutional rights guaranteed to them within Massachusetts just as much within their home states.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983.

12.     This Court has jurisdiction over all claims for relief pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and 2202, and 42 U.S.C. §§ 1983 and 1988, as this action seeks to redress the deprivation under color of the laws, statutes, ordinances, regulations, customs, and usages of the Commonwealth of Massachusetts, of the rights, privileges, or immunities secured by the United States Constitution.

13.     Venue lies in this Court under 28 U.S.C. § 1391, as the events giving rise to Plaintiffs' causes of action arose or exist in the District where the action is being brought.

-

## PARTIES

### *Plaintiff Russell Lawson, Jr.*

14.    Plaintiff Russell Lawson, Jr., is an adult citizen of the United States and a resident of Howard Beach, in the borough of Queens, in the State of New York.

15.    Plaintiff Lawson also owns real property in the Commonwealth of Massachusetts consisting of about 19 acres of land, which includes a hunting cabin, in the Town of Lanesborough. He frequently travels to this property and stays in the cabin over weekends and for one to two weeks over the summer seasons.

16.    Plaintiff Lawson is not disqualified from exercising the constitutional right to keep and bear arms under state or federal law.

17.    Plaintiff Lawson has lawfully possessed and used firearms for lawful purposes in multiple states other than Massachusetts, and he has used other non-firearm weapons for lawful purposes while on the premises of his property in Lanesborough, Massachusetts, primarily for hunting.

18.    Plaintiff Lawson has also completed multiple firearms safety courses, including one course in or around 2022 that was certified as satisfying the requirements of a "Basic Firearms Safety Course" (M.G.L.A. 140 §§ 131(b), 131P).

19.    Plaintiff Lawson desires to lawfully own, possess, and use firearms in the Commonwealth of Massachusetts for purposes that are prohibited without a non-resident LTC, including the concealed carry of a handgun for self-defense in case of confrontation and for other lawful purposes while in public, as well as for hunting with semiautomatic rifles and shotguns on his property and elsewhere in the Commonwealth where such hunting activities are otherwise lawful.

20.    But for Defendants' enforcement of this licensing scheme, Plaintiff Lawson would lawfully engage in the aforementioned activities in the lawful exercise of his constitutional right to keep and bear arms under the Second Amendment, without the need to obtain and maintain a Massachusetts non-resident LTC.

21.    Plaintiff Lawson has abstained from doing so in the absence of a Massachusetts-issued LTC given the risk of criminal prosecution and conviction,

which he reasonably fears in light of Defendants' ongoing enforcement of the laws and regulations underlying the Commonwealth's licensing scheme.

22.    In order to remove this state-imposed barrier to the lawful exercise of his Second Amendment constitutional right to keep and bear arms in Massachusetts, Plaintiff Lawson desires to obtain and maintain the necessary non-resident LTC, and he would do so but for Defendants' failure or refusal to timely process, investigate, make eligibility determinations, and/or issue LTCs to eligible first-time and renewal LTC applicants without unreasonable and excessive delays.

23.    In January of this year, Plaintiff Lawson submitted through the MIRCS Firearms Licensing Portal an application for a non-resident LTC (i.e., a "temporary license to carry firearms" pursuant to M.G.L.A. 140 § 131F) to the FRB along with the required application fee.

24.    On or about January 29, 2025, Plaintiff Lawson received an email from the FRB confirming receipt of his application and stating that he had been scheduled for his "interview appointment" in-person on the morning of June 9, 2025, at the FRB office in Chelsea, Massachusetts, which was 131 days or four months and 11 days from the date that the FRB confirmed receipt of the application.

25.    The email from the FRB setting the in-person interview indicated that June 9, 2025, was the "earliest possible date" that it could or would be scheduled. It also requested that Plaintiff Lawson reply to confirm the appointment.

26.    The distance between Plaintiff's residence in Queens, New York, and the FRB in Chelsea, Massachusetts is about 220 miles and about 4.5 hours by car. https://shorturl.at/Kzlbl (distance between Howard Beach, NY, and the FRB).

27.    Having no choice but to submit to an in-person interview at the time and place scheduled by the FRB to obtain an LTC, Plaintiff Lawson sent an email in reply to the FRB on January 31, 2025, confirming the appointment on June 9, 2025.

28.    In the meantime, Plaintiff Lawson remained subject to this state-imposed barrier to the exercise of his constitutional right to keep and bear arms and thus prohibited from lawfully carrying a concealed handgun for self-defense in case

of confrontation and for other lawful purposes while in public, as well as any hunting with semiautomatic rifles and shotguns while in the Commonwealth.

29.     While Plaintiff Lawson planned to attend the initially scheduled in-person appointment, take off work, and make the four-hour drive each way on June 9, 2025, he was ultimately unable to do so because urgent matters unexpectedly arose at work that day, which required immediate attention and thus precluded him from leaving. Additionally, leaving for the appointment would have resulted in financial hardship because he would have been at risk of being terminated had he left the job when these urgent matters needed to be addressed, his employer does not provide paid time off, and he could not afford to miss an entire day of work that week.

30.     Plaintiff Lawson's work schedule remained busy over the following month, making it difficult for him to miss an entire day of work during the workweek. On or about July 11, 2025, he sent an email to the FRB explaining the situation and requesting that a new date and time be scheduled for the interview, with at least two weeks' advance notice in order to accommodate his work schedule as best as possible.

31.     On or about July 14, 2025, Plaintiff Lawson received a reply email from the FRB stating that the interview had been rescheduled to the morning of October 20, 2025, which was 98 days or three months and six days into the future.

32.     The email rescheduling the appointment stated that October 20, 2025, was also the "earliest available" date for the appointment. In the meantime, Plaintiff Lawson remains subject to this state-imposed barrier to the exercise of his constitutional right to keep and bear arms while in the Commonwealth.

33.     Plaintiff Lawson is a member and supporter of each of the Institutional Plaintiffs in this case.

***Plaintiff Brian Burns***

34.     Plaintiff Brian Burns is an adult citizen of the United States and a resident of the City of Miromar Lakes in the State of Florida.

35.     Plaintiff Burns is a former long-term resident of Massachusetts, having resided there for over 20 years before relocating to Florida in or around 2021.

36.    Plaintiff Burns still owns real property in the Commonwealth of Massachusetts, consisting of a residence in the Town of East Falmouth.

37.    Plaintiff Burns spends a substantial portion of the year at his property in East Falmouth, as he typically stays there between July and November each year.

38.    Plaintiff Burns is not disqualified from exercising the constitutional right to keep and bear arms under state or federal law.

39.    Plaintiff Burns has lawfully owned, possessed, and used firearms for lawful purposes over many years and in several states, including Massachusetts, Indiana, New Hampshire, Maine, Utah, and Florida, and he has held state-issued firearm licenses for extended periods of time in each such jurisdiction.

40.    These state-issued firearm licenses have included a Massachusetts-issued LTC, which Plaintiff Burns has consistently held for over 20 years cumulatively as a resident or non-resident.

41.    Plaintiff Burns previously completed firearms safety training that satisfied the requirements for the Massachusetts-issued LTCs he has held.

42.    The last four of the Massachusetts-issued LTCs have been non-resident LTCs that Plaintiff Burns has renewed—or attempted in good faith to renew by timely submitting a renewal application to the FRB for renewal well before the expiration date—each year since relocating to Florida.

43.    Plaintiff Burns desires to lawfully own, possess, and use firearms in the Commonwealth of Massachusetts for purposes that require a non-resident LTC, and which are unlawful without such a license, including the possession and use of semiautomatic firearms for self-defense and other lawful purposes while at his residential property, as well as the concealed carry of a handgun for self-defense in case of confrontation and for other lawful purposes while in public.

44.    But for Defendants' enforcement of this licensing scheme, Plaintiff Burns could and would lawfully engage in the aforementioned activities in the lawful exercise of his constitutional right to keep and bear arms under the Second Amendment without the need to obtain and maintain a non-resident LTC.

45.    Plaintiff Burns has abstained from doing so in the absence of a Massachusetts-issued LTC given the risk of criminal prosecution and conviction, which he reasonably fears in light of Defendants' ongoing enforcement of the laws and regulations underlying the Commonwealth's licensing scheme.

46.    Plaintiff Burns would continuously maintain such a license for purposes of securing his ability to lawfully exercise his Second Amendment constitutional right to keep and bear arms in Massachusetts, without any lapses between expiration and renewal that subject him to criminal prosecution for engaging in such activities, and he has attempted to do so through timely and proper applications for renewal of his non-resident LTC each year since he relocated to Florida.

47.    However, Defendants' failure or refusal to timely process, investigate, make eligibility determinations, and/or issue first-time and renewal LTC applicants without unreasonable and excessive delays has resulted in lapses between the date of expiration and renewal, forcing Plaintiff Burns to cease engaging in any of these otherwise constitutionally protected activities during the period of lapse in order to avoid being subject to criminal prosecution and conviction for violating the law.

48.    For example, with at least one of the prior applications to renew his non-resident LTC, the processing was delayed to the point that the renewal was not issued until almost six months after the date of expiration, leaving him essentially unlicensed in the Commonwealth throughout this time, even though Plaintiff Burns had allowed a generous amount of time for the renewal by submitting the application at least three months in advance of the expiration date, as he normally has.

49.    This is true with Plaintiff Burns's most recent application for renewal of his non-resident LTC, which has remained pending and unprocessed for months now.

50.    Plaintiff Burns's non-resident LTC was set to expire on or around December 11, 2024.

51.    He submitted his renewal application to the FRB by first-class mail on or about October 29, 2024, almost six weeks before the expiration date.

52.    Since that time and to this day, Plaintiff Burns has received no response from the FRB, via mail, email, or phone, concerning the status of his application.

53.    Throughout this period, Plaintiff Burns repeatedly inquired with the FRB via email and telephone about the status of the application: he has sent numerous emails with no response; he has left numerous voicemail messages when the phone system has accepted messages, although most of the time the system reports that it is unable to accept any new messages because the voicemail box is "full;" and he has made numerous other phone calls to no avail when no one has answered the phone, even after letting it ring or waiting on hold for lengthy periods.

54.    Because Plaintiff Burns's LTC expired on or about December 11, 2024, he is and has been prohibited from engaging in any of the otherwise constitutionally-protected activities for which Massachusetts requires a non-resident LTC. Thus, over the last eight months, he has been unable to lawfully possess or use semiautomatic firearms for self-defense and other lawful purposes while at his residential property in Massachusetts and unable to carry a handgun for self-defense in case of confrontation and for other lawful purposes while anywhere in public.

55.    Plaintiff Burns will remain under this state-imposed disability against his Second Amendment right to keep and bear arms in Massachusetts unless and until the FRB acts on his application and issues a renewed non-resident LTC.

56.    Further, given Defendants' pattern of continually failing or refusing to timely process, investigate, make eligibility determinations, and/or issue first-time and renewal LTC applicants without unreasonable and excessive delays, Plaintiff Burns remains at real risk of repeatedly being trapped in a state of legal purgatory during the period of lapse between the expiration and renewal date each year. Again, this year alone, he has been trapped in such a state for three-quarters of the year.

57.    Plaintiff Burns is a member and supporter of each of the Institutional Plaintiffs in this case.

### *Plaintiff Christopher Penta*

58.    Plaintiff Christopher Penta is an adult citizen of the United States and a resident of the Town of Hampstead, New Hampshire.

59.    Plaintiff Penta frequently travels to and within the Commonwealth of Massachusetts both in connection with his work and to visit family who live there, a routine he has been following for several years since about 2018.

60.    Plaintiff Penta is not disqualified from exercising the constitutional right to keep and bear arms under state or federal law.

61.    He has lawfully owned, possessed, and used firearms for lawful purposes over many years and in multiple states.

62.    Plaintiff Penta is a former resident of Massachusetts, Florida, and Kansas, and he has held state-issued firearm licenses during the period that he was a resident in each of those respective states.

63.    The license from New Hampshire, Plaintiff Penta's current home state, remains active and has been active since he relocated there in 2017.

64.    Plaintiff Penta has also maintained a non-resident LTC in Massachusetts since 2018, which he has renewed—or attempted in good faith to renew by timely submitting a renewal application well before the expiration date—each year since relocating to New Hampshire.

65.    Plaintiff Penta previously completed firearms safety training that satisfied the requirements for the LTCs he has been issued in Massachusetts. He has completed additional basic firearms safety training in connection with the licenses he has been issued in other states.

66.    Plaintiff Penta desires to lawfully own, possess, and use firearms in Massachusetts for purposes that require a non-resident LTC, and which are unlawful without such a license, including the concealed carry of a handgun for self-defense in case of confrontation and for other lawful purposes while in public.

67.    But for Defendants' enforcement of this licensing scheme, Plaintiff Penta could and would lawfully engage in the aforementioned activities in the lawful exercise of his constitutional right to keep and bear arms under the Second Amendment without the need to obtain and maintain a non-resident LTC.

68.    Plaintiff Penta has abstained from doing so in the absence of a Massachusetts-issued LTC given the risk of criminal prosecution and conviction,

which he reasonably fears in light of Defendants' ongoing enforcement of the laws and regulations underlying the Commonwealth's licensing scheme.

69.    Plaintiff Penta would continuously maintain such a license for purposes of securing his ability to lawfully exercise his Second Amendment constitutional right to keep and bear arms in Massachusetts, without any lapses between expiration and renewal that subject him to criminal prosecution for engaging in such activities, and he has attempted to do so through timely and proper applications for renewal of his non-resident LTC each year since relocating to New Hampshire.

70.    However, Defendants' failure or refusal to timely process, investigate, make eligibility determinations, and/or issue first-time and renewal LTC applicants without unreasonable and excessive delays has resulted both in a significant delay in initially obtaining a non-resident LTC and subsequent lapses between the date of expiration and renewal of the LTC, throughout which periods Plaintiff Penta has been forced to forestall engaging in any of these otherwise constitutionally protected activities in order to avoid being subject to criminal prosecution and conviction.

71.    To illustrate, Plaintiff Penta submitted his initial application for a non-resident LTC in or around December of 2017, but the LTC was not issued until April of 2018, some four months later. Then, with one of his subsequent renewal applications a few years later, the processing was delayed to the point that the renewal was not issued until almost two months after the expiration date, leaving him essentially unlicensed throughout this time, even though Plaintiff Penta had submitted the renewal application two to three months in advance of the expiration.

72.    This was also true with Plaintiff Penta's most recent application for renewal of his Massachusetts non-resident LTC.

73.    His non-resident LTC was set to expire on or about June 6, 2025.

74.    Plaintiff Penta submitted his renewal application to the FRB via first-class mail on or about April 10, 2025, almost two months in advance of the expiration.

75.    He received an email from the FRB on or about May 6, 2025, confirming receipt of the LTC renewal application.

76.    Between then and June 6, 2025, the date of expiration, Plaintiff Penta received no word from the FRB regarding the status of his renewal application.

77.    Over this same period, Plaintiff Penta contacted the FRB numerous times, by phone and email, inquiring about the status of the renewal, in an effort to secure the renewal before expiration of the license.

78.    However, the FRB did not respond to any of the email or phone messages and, like Plaintiff Burns, he was unable to reach a live person on the phone.

79.    Consequently, June 6, 2025, came and went with no renewal and no further word from the FRB, after which point Plaintiff Penta became prohibited from engaging in any of the otherwise constitutionally-protected activities for which Massachusetts requires a non-resident LTC.

80.    Over the next five weeks, Plaintiff Penta continued making inquiries via email and phone, still to no avail, such that he remained under this state-imposed disability against his Second Amendment right to keep and bear arms in Massachusetts despite his ongoing good faith efforts to comply with this scheme.

81.    It was not until on or about July 14, 2025, that Plaintiff Penta received any further word from the FRB. On that date, the FRB sent him an email stating that his application had been processed and his LTC was in the mail.

82.    The next day, on or about July 15, 2025, the LTC arrived in the mail, by which time Plaintiff Penta had been without an active LTC and thus under the state-imposed disability for more than five weeks, throughout which time he was unable to engage in the firearms-related activities requiring a LTC in Massachusetts, including his desired conduct of carrying of a concealed handgun for self-defense in case of confrontation and for other lawful purposes while anywhere in public.

83.    While Plaintiff Penta *now* has a renewed LTC, given Defendants' pattern of continually failing or refusing to timely process, investigate, make eligibility determinations, and/or issue first-time and renewal LTC applicants without unreasonable and excessive delays, Plaintiff Penta remains at real risk of being trapped in a state of legal purgatory during the period of lapse between the expiration and renewal date each year absent the relief being sought herein.

84.    Again, this year alone, that lapse persisted for over five weeks, leaving Plaintiff Pena subject to criminal prosecution for engaging in conduct otherwise fully protected under the Second Amendment right to keep and bear arms.

85.    Plaintiff Penta is a member and supporter of each of the Institutional Plaintiffs in this case.

### Plaintiff Second Amendment Foundation, Inc.

86.    Plaintiff Second Amendment Foundation, Inc. ("SAF") is a non-profit educational foundation incorporated under the laws of the State of Washington with its principal place of business in Bellevue, Washington. SAF seeks to preserve the effectiveness of the Second Amendment through educational and legal action programs. SAF has over 720,000 members and supporters nationwide, including many non-resident members who travel to and within Massachusetts.

87.    The purposes of SAF include education, research, publishing, and legal action focusing on the constitutional right to privately own and possess firearms under the Second Amendment, and the consequences of gun control. This Court's interpretation of the Second Amendment directly impacts SAF's organizational interests, as well as SAF's members and supporters in several states who are non-residents of Massachusetts but who travel to and within the Commonwealth and who seek to enjoy the lawful exercise of their Second Amendment rights while there. Many of SAF's individual members and supporters have been adversely and directly harmed and injured by Defendants' enforcement of the laws complained of herein. SAF brings this action on behalf of itself, its members, and supporters who possess all the indicia of membership, and similarly situated members of the public.

88.    Plaintiff SAF brings this action on behalf its members, including the named Plaintiffs herein, each of whom is a member and supporter of SAF.

89.    Plaintiff SAF's members have been adversely and directly harmed by Defendants' enforcement of the laws, regulations, policies, practices, and customs challenged herein.

90.    Plaintiff SAF's members would otherwise have standing to sue in their own right, as established herein.

14

91.    The interests that Plaintiff SAF seeks to protect are germane to the organization's purpose.

92.    Neither the claims that Plaintiff SAF asserts nor the relief it requests requires the participation of individual members in the lawsuit.

### Plaintiff Gun Owners Action League

93.    Plaintiff Gun Owners Action League ("GOAL") is a 501(c)(4) non-profit organization with a principal place of business at 287 Turnpike Road, Suite 115, Westborough, MA 01581. The organization currently has about 22,000 members and its purpose is to restore, protect, and defend the Second Amendment and its exercise in Massachusetts.

94.    Plaintiff GOAL was founded on November 27, 1974, out of necessity to restore, protect, and defend the Second Amendment and its exercise in the Commonwealth of Massachusetts through legislative lobbying efforts, legal action, training, and education.

95.    Plaintiff GOAL brings this action on behalf its members, including the named Plaintiffs herein, each of whom is a member and supporter of GOAL.

96.    Plaintiff GOAL's members have been adversely and directly harmed by Defendants' enforcement of the laws, regulations, policies, practices, and customs challenged herein.

97.    Plaintiff GOAL's members would otherwise have standing to sue in their own right, as established herein.

98.    The interests that Plaintiff GOAL seeks to protect are germane to the organization's purpose.

99.    Neither the claims that Plaintiff GOAL asserts nor the relief it requests requires the participation of individual members in the lawsuit.

### Defendant Andrea Joy Campbell

100.    Defendant Andrea Joy Campbell ("Defendant Campbell") is sued in her official capacity as Attorney General of the Commonwealth of Massachusetts.

101.    Defendant Campbell is an independent constitutional officer responsible for regulating, implementing, and enforcing the Commonwealth's laws and regulations related to the sales, transfer, possession, and ownership of firearms.

102.    Defendant Campbell is therefore responsible for regulating, implementing, and enforcing the Commonwealth's laws and regulations which collectively comprise the licensing scheme, and the unreasonable and excessive delays in the licensing process, of which Plaintiffs complain herein.

103.    Defendant Campbell has enforced, is presently enforcing, and is threatening to enforce the licensing scheme notwithstanding the unreasonable and excessive delays that have deprived and are continuing to deprive Individual Plaintiffs and similarly situated non-resident members of Institutional Plaintiffs of the ability to lawfully engage in conduct otherwise protected under the Second Amendment.

104.    Defendant Campbell has the power and authority to cease enforcement of the licensing scheme and the unreasonable and excessive delays of the process, consistent with the relief Plaintiffs seek through this action. *See* M.G.L.A. c. 12 § 1 and § 3.

### Defendant Terrence M. Reidy

105.    Defendant Terrence M. Reidy ("Defendant Reidy") is sued in his official capacity as Secretary of the Commonwealth's Executive Office of Public Safety and Security (EOPSS), *see* https://shorturl.at/GkrPm (Official Website of the Commonwealth of Massachusetts).

106.    Defendant Reidy is an independent constitutional officer within the Executive branch, *see* https://bit.ly/3NXjtR1 (Massachusetts Government Organizational Chart); https://bit.ly/44tCfF7 (Massachusetts Independent Agencies and Constitutional Officers).

107.    Defendant Reidy is responsible for overseeing the Firearms Records Bureau (FRB) through the Department of Criminal Justice Information Services (DCJIS), which itself is overseen by the EOPSS, https://shorturl.at/GkrPm.

108.   Defendant Reidy is thus responsible for regulating and enforcing the Commonwealth's laws and regulations related to the sales, transfer, possession, and ownership of firearms which collectively comprise the licensing scheme, and the unreasonable and excessive delays in the licensing process, of which Plaintiffs complain herein.

109.   Defendant Reidy has enforced, is presently enforcing, and is threatening to continue to enforce the licensing scheme notwithstanding the unreasonable and excessive delays that have deprived and are continuing to deprive Individual Plaintiffs and similarly situated non-resident members of Institutional Plaintiffs of the ability to lawfully engage in conduct otherwise protected under the Second Amendment.

110.   Defendant Reidy has the power and authority to cease such enforcement of the licensing scheme and the unreasonable and excessive delays of the process, consistent with the relief Plaintiffs seek through this action. *See* M.G.L.A. c. 6A § 2 and § 3.

### *Defendant Geoffrey D. Noble*

111.   Defendant Geoffrey D. Noble ("Defendant Noble") is sued in his official capacity as Superintendent of the Massachusetts State Police, *see* https://shorturl.at/r1WVW, which is an organization within the EOPSS, https://shorturl.at/DnotW.

112.   In his capacity as Superintendent, Defendant Noble is the head of the Massachusetts State Police, which "serves as the statewide law enforcement agency and maintains investigative, tactical, and support units throughout the Commonwealth." https://www.mass.gov/orgs/massachusetts-state-police.

113.   Among his responsibilities as head of this statewide law enforcement agency, Defendant Noble is charged with the duties of processing, investigating, making eligibility determinations, and/or issuing LTCs to residents and non-residents in accordance with the Commonwealth's licensing scheme, and with delegating such duties to other state or local officials consistent with the discretion he is afforded to make such delegations. *See* M.G.L.A. c. 140 §§ 131, 131F.

17

114.    Defendant Noble is thus responsible for regulating and enforcing the Commonwealth's laws and regulations comprising the licensing scheme, and the unreasonable and excessive delays in the licensing process, of which Plaintiffs complain herein.

115.    Defendant Noble has accordingly enforced, is presently enforcing, and is threatening to continue to enforce the licensing scheme notwithstanding the unreasonable and excessive delays that have deprived and are continuing to deprive Individual Plaintiffs and similarly situated non-resident members of Institutional Plaintiffs of the ability to lawfully engage in conduct otherwise protected under the Second Amendment.

116.    Defendant Noble has the power and authority to cease such enforcement of the licensing scheme and the unreasonable and excessive delays of the process that are being perpetuated by and through the manner in which the Massachusetts State Police are and have been enforcing the same, consistent with the relief Plaintiffs seek through this action.

***Defendant Jamison R. Gagnon***

117.    Defendant Jamison R. Gagnon ("Defendant Gagnon") is sued in his official capacity as Commissioner of the Massachusetts Department of Criminal Justice Information Services (DCJIS). *See* https://shorturl.at/3TF3c.

118.    Defendant Gagnon is the head of the DCJIS, which "manages and administers the Commonwealth's law enforcement information and criminal records systems, the Firearms Records Bureau (FRB), and the post-conviction victim notification program," https://shorturl.at/1qg5N, and which is also an organization within the EOPSS, https://shorturl.at/DnotW.

119.    Among his responsibilities as head of DCJIS, Defendant Gagnon is responsible for overseeing the operations of the FRB, which administers the processing of resident and non-resident first-time and renewal applications for LTCs in accordance with the Commonwealth's licensing scheme, including the design of the standardized application form, coordinating background checks, and maintaining the statewide database for all licenses issued in the Commonwealth. Additionally, on

information and belief, the FRB, under Defendant Gagnon's oversight, serves as Defendant Noble's designee for the processing and issuance of all non-resident first-time and renewal applications for LTCs in accordance with the Commonwealth's licensing scheme. *See* M.G.L.A. c. 140 §§ 121F(e), (g) & 131F; https://shorturl.at/CyIeb.

120.    Defendant Gagnon has accordingly enforced, is presently enforcing, and is threatening to continue to enforce the licensing scheme notwithstanding the unreasonable and excessive delays that have deprived and are continuing to deprive Individual Plaintiffs and similarly situated non-resident members of Institutional Plaintiffs of the ability to lawfully engage in conduct otherwise protected under the Second Amendment.

121.    Defendant Gagnon has the power and authority to cease such enforcement of the licensing scheme and the unreasonable and excessive delays of the process that are being perpetuated by and through the manner in which the FRB is and has been enforcing the same, consistent with the relief Plaintiffs seek through this action.

### THE REGULATORY SCHEME AND HANDGUN BAN

122.    Law-abiding adult citizens like the Plaintiffs in this case, who are not otherwise disqualified in any way from exercising their right to keep and bear arms under any state or federal law, who seek only to exercise this right lawfully within Massachusetts, and who even already hold or qualify for licenses under similar licensing regimes of other states, are subjected to significant limitations on their ability to exercise this right anywhere within the borders of the Commonwealth due merely to their status as nonresidents.

123.    Unless and until such individuals apply for, satisfy all the requirements of, and actually obtain a *Massachusetts*-issued LTC, these nonresidents must essentially check at the border of the Commonwealth their Second Amendment right to keep and bear arms. Upon entry without a valid and active Massachusetts-issued LTC in hand, law-abiding nonresident adults are subject to the following constraints in keeping and bearing firearms anywhere within the Commonwealth:

- They may only "possess rifles and shotguns that are not large capacity or semi-automatic and ammunition therefor," and then only if they have a "permit, card or license issued from their state of residence which has substantially similar requirements to those of the commonwealth for a firearm identification card as determined by the colonel of the state police. . ." M.G.L.A. 140 § 129C(i).[1]

- They may possess such arms (i.e., "rifles and shotguns that are not large capacity or semi-automatic and ammunition therefor") solely for the specific purposes enumerated in M.G.L.A. 140 § 129C(j), which are as follows:

  (i) "to hunt during hunting season with a nonresident hunting license or a hunting license or permit lawfully issued from their state of residence, which has substantially similar requirements to those in section 11 of chapter 131 [general requirements for a sporting, hunting, fishing, or trapping license], as determined by the colonel of the state police. . .";

  (ii) "while on a firing or shooting range";

  (iii) "while traveling in or through the commonwealth; provided, that the rifles and shotguns that are not large capacity or semi-automatic shall be unloaded and in a locked container pursuant to sections 131C and 131L"; or

  (iv) "while at a firearm showing or display organized by a regularly existing gun collectors' club or association."

- For any "firearm" (defined as "a stun gun or a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of the barrel or barrels is less than 16 inches or 18 inches in the case of a shotgun as originally manufactured," M.G.L.A. 140 § 121), nonresidents may only "carry a firearm on their person while in a vehicle lawfully traveling through the

---

[1]    To date, Defendant Noble has failed to provide a list of states that have substantially similar requirements.

commonwealth," and then only if the firearm "remain[s] in the vehicle and if the firearm is outside its owner's direct control it shall be stored in the vehicle in accordance with section 131C," M.G.L.A. 140 § 129C(k).

124.    Nonresidents seeking to carry or possess a firearm in Massachusetts in any other manner or for any other purpose must obtain a license issued by the colonel of the state police, and they are relegated to a "temporary license to carry firearms" under section 131F of Chapter 140, a more restrictive form of the already restrictive "license to carry firearms" under section 131 of Chapter 140 which residents must obtain in order to lawfully exercise their right to keep and bear arms.

125.    Such a "temporary" license "shall be issued" to a nonresident, but only on the conditions that (i) "it appears that the applicant is not a prohibited person" and (ii) "is not determined unsuitable to be issued a license as set forth in section 121F."[2] M.G.L.A. 140 § 131F.

126.    Generally, such temporary licenses "shall be valid for a period of one year but the colonel may renew such license if such renewal is necessary," M.G.L.A. 140 § 131F,[3] whereas a resident LTC remains valid for a period of six years, § 131(e). Further, while the Commonwealth provides a grace period that insulates residents from criminal liability during lapses between licenses,[4] it affords nonresidents no

---

[2]    A determination of "unsuitability" mandates denial of an LTC application. Such a determination "shall be based on reliable, articulable and credible information that the applicant has exhibited or engaged in behavior that suggests that, if issued a permit, card or license, the applicant may create a risk to public safety or a risk of danger to themselves or others." M.G.L.A. 140 § 121F(k). "A licensing authority shall deny any application for a permit, card or license under sections 122, 122B, 122D, 129B, 131 or 131F, or renewal thereof, to a person the licensing authority determines to be unsuitable to hold a permit, card or license." *Id.*

[3]    A temporary license may be valid for up to two years for nonresidents who are employed within certain select industries or who are members of the armed services stationed within the boundaries of the Commonwealth. M.G.L.A. 140 § 131F.

[4]    "[A]n expired license to carry firearms issued under section 131 … shall remain valid for all lawful purposes" as follows: (i) "until the application for renewal is approved or denied" if the licensee applied renewal before the expiration date; (ii) if

such grace period; rather, nonresidents must depend on the Commonwealth to timely and properly process their applications to renew their temporary LTCs.

127.    Besides the limited one-year period of validity and lack of a grace period after expiration, the process for applying and seeking renewal of a temporary license to carry largely mirrors the application and renewal process for a resident LTC.

128.    First, there is a $100 fee for any new or renewal application. M.G.L.A. 140 § 121F(o)(i).

129.    Second, the application must be made on a standard form provided by the commissioner of the Department of Criminal Justice Information Services, "which shall require the applicant, or parent or guardian of a minor, to affirmatively state, under the pains and penalties of perjury, that the applicant is not disqualified on any of the grounds enumerated in this section [i.e., § 121F] from being issued such … license." M.G.L.A. 140 § 121F(g).

130.    Third, the standard form for a non-resident temporary license to carry declares that, "[e]very applicant is required to appear in-person at the Firearms Records Bureau (FRB) for the first non-resident license to carry (LTC) application," and "subsequent in-person appearances may be required at the discretion of the FRB." Massachusetts Department of Criminal Justice Information Services Firearms Records Bureau, *Application for Non-Resident Temporary License to Carry Firearms*, https://shorturl.at/ckayW. The FRB is located in Chelsea, Massachusetts. *Id.*

131.    Fourth, as the standard application form further provides, all new and renewal applications are subject to "fingerprint-based background checks annually as required by statute (MGL c. 140, § 131F)." https://shorturl.at/ckayW.

132.    Fifth, all first-time applicants (except those who fall within a narrow exemption for law enforcement officers or military personnel) must complete "a Massachusetts Basic Firearms Safety Course" (BFS) and provide a certificate of

---

the licensee is on active duty in the military on the expiration, for at least 180 days following the licensee's release from such duty; and (iii) for all other licensees (i.e., those who are not in the military and do not apply for renewal before the expiration date), "90 days beyond the stated date of expiration." M.G.L.A. 140 § 121F(s)(i)-(iii).

-

completion. M.G.L.A. 140 §§ 131(b), 131P (a); 515 MA ADC 3.05; https://shorturl.at/ckayW. This safety course and its instructor must be certified by the colonel of the state police. M.G.L.A. 140 § 131P(b)-(c); https://shorturl.at/ckayW (emphasis removed) ("This course must have been taken with an instructor who is certified by the Colonel of the Massachusetts State Police[.]") Applicants are directed to a list of certified courses, https://shorturl.at/lc1cT, and a list of certified instructors, https://shorturl.at/L765g, in order to complete this requirement.

133.    Further, in connection with the "Act Modernizing Firearms Laws" that became effective in October of 2024, the Commonwealth has added a "live fire" training requirement to the BFS that must be completed. Memoranda published by the Commonwealth's Executive Office of Public Safety and Security declare that all applicants applying for the first time or for a renewal LTC after the effective date of the new law must complete a BFS with a live-fire component in conjunction with the application. *Memorandum An Act Modernizing Firearm Laws – Guidance*, dated Sept. 30, 2024, Executive Office of Public Safety and Security, https://shorturl.at/ioMyj; *Memorandum An Act Modernizing Firearm Laws – Guidance*, dated Nov. 14, 2024, Executive Office of Public Safety and Security, https://shorturl.at/DyRSn. While these public advisories declare that the new live-fire training requirement applies to all first-time applicants and all renewal applicants who have not previously obtained the necessary training,[5] "the new BFS course" is still under development and is thus apparently not yet being implemented but will be implemented as soon as the requirements are fully "operationalized," *id.*[6]

---

[5]    *See* Memorandum dated November 14, 2024, Frequently Asked Questions #2:

> 2.    May a licensing authority accept a basic firearms safety certificate pursuant to the requirements of the current law prior to the Act taking effect?
> a.    Yes, and a licensing authority may continue to do so until section 74 takes effect, on April 2, 2026.

[6]    *See* Memorandum dated November 14, 2024, Frequently Asked Questions #1:

134.   Sixth, the statutory time periods for the processing of temporary LTCs (which also mirror the time periods for resident LTC applications) are as follows:

- Upon receipt of the application, the licensing authority is required to provide the applicant with a receipt documenting, *inter alia*, the date it was received. M.G.L.A. 140 § 121F(b).

- "Within 7 days of receipt of the completed application the licensing authority shall forward 1 copy of the application and 1 copy of the applicant's fingerprints to the colonel of the state police," provided that re-fingerprinting "shall not be required in issuing a renewal if the applicant's fingerprints are on file with the department of the state police." § 121F(c).

- "[W]ithin 30 days of receipt of the application and fingerprints," the colonel of the state police "shall advise the licensing authority, in writing, of any disqualifying criminal record of the applicant arising from within or without the commonwealth and whether there is reason to believe that the applicant is disqualified from possessing the permit, card or license requested," or, "[i]f the information available to the colonel does not indicate that issuing the permit, card or license would be in violation of state or federal law, the colonel shall certify such fact to the licensing authority within said 30-day period." § 121F(d).

- "A licensing authority shall, within 40 days from the date of receipt of a completed application for any firearm license, card or permit issued under sections 122, 122B, 122D, 129B, 131 or 131F, or renewal of the same, either approve the application and issue the permit, card or license or deny the application and notify the applicant of the reason for such denial in writing; provided, however, that no permit, card or license shall be issued unless the

_____

1.   When will the new BFS course be ready?
     a.   EOPSS is diligently working with the MSP and the MPTC to operationalize the requirements of section 74 of the *Act*, including the new curriculum requirements for the BFS course, in accordance with the deadlines prescribed by the new law."

colonel of the state police has certified that the information available indicates that issuing the permit, card or license is not in violation of state or federal law." § 121F(a).

135.    In a nutshell, from the date of receipt of a completed application (and fingerprints, when necessary): (i) within <u>seven</u> days, the licensing authority shall forward the application to the colonel of the state police; (ii) within <u>30</u> days, the colonel shall determine whether the applicant is disqualified for any reason and, if not, certify the applicant is not disqualified; and (iii) within <u>40</u> days, the colonel shall either approve the application and issue the permit or deny it within an explanation.

136.    However, notwithstanding these statutorily-mandated timelines, the Commonwealth's website declares that "license processing" for residents "may take up to 60 days," while "license processing" for non-residents "may take up to 90 days." https://shorturl.at/for3d.

137.    Further, as of July 25, 2025, the same website declares: "*Currently approving and printing licenses that were submitted for review by police departments between March 15 and March 28.*" https://shorturl.at/for3d (italics original).

138.    A violation of this scheme carries serious consequences, for any knowing possession of a firearm without an LTC constitutes a felony and "shall be punished by imprisonment in the state prison for not less than two and one-half years nor more than five years, or for not less than 18 months nor more than two and one-half years in a jail or house of correction." M.G.L.A. c. 269, § 10(a)(6).

## LEGAL FRAMEWORK

139.    The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. Const. Amend. II. The Second Amendment is incorporated against the Commonwealth of Massachusetts and its officials through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 749-50 (2010). "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 24. Moreover, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a

firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " *Id.* (internal citations omitted, emphasis added.). Stated otherwise, if a law restricts conduct falling within the scope of the Second Amendment's text, that law is presumed invalid and can only be saved if the government proves "the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.' " *United States v. Rahimi*, 602 U.S. 680, 681 (2024) (quoting *Bruen*, 597 U.S. at 29).

140.    This analysis requires asking *both* "how and why" past laws burdened the Second Amendment protected right, and historical laws can only serve as true analogues if their modern comparators are "comparably justified." *Bruen*, 597 U.S. at 29; *Rahimi*, 602 U.S. at 709 (Gorsuch, J., concurring). "Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding." *Rahimi*, 602 U.S. at 692. It is the government's burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms" in this sense. *Bruen*, 597 U.S. at 19; *see also id.* at 60 ("[W]e are not obliged to sift the historical materials for evidence to sustain New York's statute. That is respondents' burden."). If the government fails to meet its burden, then the restrictions at issue must be declared unconstitutional and enjoined.

141.    When examining a challenged law, the court must consider the relevant time period and whether the historical analogues proffered from that period are relevantly similar, assessing both "the how and why" of the proffered analogues. *Bruen*, 597 U.S. at 29. The relevant time period is 1791. *Bruen*, 597 U.S. at 34 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 634-35 (2008), italics added in *Bruen*) (" 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*' "); *Lara v. Comm. of Penn. State Police*, 125 F.4th 428, 441 (3d Cir. 2025) ("We reiterate, for the reasons stated in our earlier opinion, *Lara*, 91 F.4th at 133-34, that the constitutional right to keep and bear arms should

be understood according to its public meaning in 1791…"); *United States v. Connelly*, 117 F.4th 269, 281 (5th Cir. 2024) ("Offering three laws passed scores of years post-Ratification (and a fourth passed nearly half a century beyond that) misses the mark by a wide margin."); Mark Smith, *Attention Originalists: The Second Amendment Was Adopted In 1791, Not 1868*, 24 Harvard J.L. & Pub. Pol'y Per Curiam 31 (2022) ("If periods after 1791 are consulted at all, it is only to confirm that subsequent authorities, generally very shortly after the Founding, remained consistent with the public understanding in 1791."). By contrast, 20th century and late 19th century statutes and regulations "cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 597 U.S. at 66 & n.28. Only those restrictions with roots at the Founding are sufficiently "enduring" and "well-established" to comport with the Second Amendment's "unqualified command." *Id.* at 17 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

142.    It is clear that the conduct at issue in this case—the possession, use, and public carry of semiautomatic firearms, in particular handguns—is covered by the text of the Second Amendment. It is also clear that a government cannot justify with any relevant historical analogues a licensing scheme that subjects law-abiding citizens (resident or non-resident) to criminal liability for engaging in such conduct without a license while excessively or unreasonably delaying issuance of the license.

143.    The Second Amendment's "reference to 'arms' does not apply 'only [to] those arms in existence in the 18th century.' " *Bruen*, 597 U.S. at 28 (quoting *Heller*, 554 U.S. at 582). "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* And "[w]hatever the likelihood that handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common' use for self-defense today. They are, in fact, 'the quintessential self-defense weapon.'" *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 629 (cleaned up)).

-

144.    "Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Bruen*, 597 U.S. at 28 (citing *Caetano v. Massachusetts*, 577 U.S. 411, 411-412 (2016) (*per curiam*), concerning stun guns). Moreover, "[s]emiautomatic weapons," such as those that the Commonwealth of Massachusetts makes it illegal for non-residents to possess, use, or carry for lawful purposes without a state-issued LTC, "traditionally have been widely accepted as lawful possessions." *Staples v. United States*, 511 U.S. 600, 612 (1994).

145.    The Second Amendment guarantees individuals a fundamental right to keep and carry such arms for self-defense and defense of others in the event of a violent confrontation. *Heller*, 554 U.S. at 584; *McDonald*, 561 U.S. at 778; *Caetano v. Massachusetts*, 577 U.S. at 421 (Alito, J., concurring); *Bruen*, 597 U.S. at 20, quoting *Heller*, 554 at 592 (The right " 'guarantee[s] the individual right to possess and carry weapons in case of confrontation.' "). This is particularly acute when it comes to handguns, "the quintessential self-defense weapon." *Heller*, 554 U.S. at 629.

146.    Thus, in *Bruen*, the Supreme Court struck down as unconstitutional New York's "good cause" licensing requirement, holding that a state may not condition "the general right to public carry" handguns on a "special need for self-defense" or other "exceptional circumstances," because the Second Amendment "presumptively protects" carrying firearms in public for lawful purposes, including self defense. *Bruen*, 597 U.S. at 33, 38. Moreover, and important to this case, the Court made clear that any purported "shall issue" licensing scheme "put toward abusive ends" remains subject to constitutional challenge under the above principles "where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Id*. That is precisely problem we have here with Massachusetts's licensing scheme.

## COUNT I
### CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF
### U.S. CONST. AMENDS. II, XIV
### RIGHT TO BEAR ARMS
### 42 U.S.C. § 1983

147.    Plaintiffs incorporate herein by reference the foregoing paragraphs as if fully set forth herein.

148.    There is an actual and present controversy between the parties.

149.    The Individual Plaintiffs in this case and the similarly situated non-resident members of Institutional Plaintiffs seek to preserve the freedoms guaranteed them by "the right of the people to keep and bear Arms" under the Second Amendment while they are present in the Commonwealth of Massachusetts.

150.    Their ability to exercise this right lawfully is conditioned and directly dependent upon strict compliance with the Commonwealth's firearm licensing scheme and specifically obtaining and consistently maintaining the one-year "temporary" LTC to which non-residents are relegated under the statutory scheme, in the absence of which they face substantial criminal liability for the mere possession, use, and public carry of semiautomatic firearms, including handguns—conduct unquestionably covered under the text of the Second Amendment.

151.    Thus, first-time applicants seeking to initially obtain the license required to exercise their Second Amendment right within the Commonwealth are at the mercy of Defendants' licensing process to secure this "permission" without unreasonable or excessive delays in processing, investigation, or issuing LTCs.

152.    Renewal applicants are similarly at the mercy of this process in seeking to *maintain* this state-mandated licensure requirement without lapses or interruptions between the expiration date and renewal date. Avoiding such lapses or interruptions is as essential as securing the licensure in the first instance: because the licensing scheme deprives non-residents of the grace period afforded residents, any lapse between the expiration date and the date of renewal renders the LTC invalid and thus leaves the non-resident subject to criminal liability for any exercise of the otherwise constitutionally protected activities prohibited without a valid LTC.

153.    Plaintiffs do not concede that a firearms licensing scheme is itself a constitutional limitation on the ability of law-abiding citizens to acquire, possess, and use firearms for self-defense and other lawful purposes, as there is no broad and enduring historical tradition of government licensure to keep or bear arms in public.

154.    Similarly, even assuming that a firearms licensing scheme placing constraints on the ability of law-abiding citizens to acquire, possess, and use firearms for self-defense and other lawful purposes generally passes constitutional muster, Plaintiffs do not concede the constitutionality of any particular length of delay, waiting periods, or other processes that mandate or result in the lapse of certain periods of time before the license is actually issued, as there is no broad and enduring historical tradition of delaying such citizens' ability to exercise these rights unless and until they comply with a government licensure program.

155.    The constitutionality of firearms licensing schemes in general and the constitutionality of associated delays, waiting periods, and other such time-based limitations imposed against the Second Amendment right are the subject of existing and future litigation elsewhere and are thus simply beyond the scope of this lawsuit.

156.    Accordingly, Plaintiffs do not concede that the existence of Massachusetts's licensing scheme itself is constitutional, nor do they concede that the delays and waiting periods associated with the Commonwealth's licensing processes are constitutional. However, even affording the Commonwealth the greatest degree of deference to its legislative mandates and executive policy-making by assuming— without conceding—that the parameters of this scheme pass constitutional muster, Defendants are repeatedly and consistently failing or refusing to comply with their own directives purportedly intended to ensure reasonable timeframes for license processing: i.e., that (i) within <u>seven</u> days, the licensing authority shall forward the application to the colonel of the state police; (ii) within <u>30</u> days, the colonel shall determine whether the applicant is disqualified for any reason and, if not, certify the applicant is not disqualified; and (iii) within <u>40</u> days, the colonel shall either approve the application and issue the permit or deny it within an explanation.

157.    Defendants own prevailing policies unabashedly admit—indeed declare as a matter of established policy—that they do not, cannot, or will not adhere to any of their own statutory baselines: they advise the general public that "license processing" for residents "may take up to 60 days," while "license processing" for non-residents "may take up to 90 days," https://shorturl.at/for3d, and they readily offer the statistic that they are currently "approving and printing licenses that were submitted for review by police departments between March 15 and March 28"—i.e., they admit they are in fact not actually issuing licenses until some three months after the licensing authority has forwarded them the application for processing, *id.* Notably as well, this statistic does not distinguish between resident and non-resident applicants, indicating that even resident applications are being held up well past the timeframes purportedly established to ensure reasonable timeframes for processing.

158.    And the reality for non-resident applicants is even worse than what Defendants admit: when Plaintiff Lawson submitted his first-time application way back in January of this year, right off the bat, the FRB scheduled him for a personal interview for a date *more than four months* into the future and then, when Plaintiff Lawson needed to reschedule that date, the FRB for a date *98 days* into the future, both times stating that these were the earliest available dates. Even setting aside the time period between the first and second scheduled interviews (i.e., June 9 to October 20), whenever the FRB finally gets around to actually issuing the LTC after the interview on October 20, Plaintiff Lawson's application will have been languishing far longer than what the Commonwealth's own processing directives mandate. All the while, he has been and will continue to be deprived of the ability to lawfully engage in any of the activities that require a non-resident LTC in Massachusetts even though he is guaranteed the right to do so under the Second Amendment. The same is true for all similarly situated first-time applicants whose applications are left to languish well beyond the timetables purportedly designed to ensure reasonable processing periods for those seeking relief from this state-imposed disability.

159.    The plight of renewal applicants, like Plaintiffs Burns and Plaintiff Penta, is no better. Plaintiff Burns to this day remains without a renewal of his non-

-

resident LTC which expired several months ago in December of last year, as the FRB
has apparently simply failed or refused to process the application despite his repeated
follow-up inquiries and attempts to push it along that the FRB has ignored. While
Plaintiff Penta *now* has a renewed LTC, that was only after a greater than three-
month delay between the date of submission and date of renewal and a five-week
delay between the date of expiration and the date of renewal. And, these delays in
the processing are part of a persistent pattern, as both of them have been stuck in
legal purgatory with prior applications to renew their non-resident LTCs. The same
is true for the similarly situated non-residents seeking to *maintain* the LTC
necessary to ensure *continuous* ability to lawfully keep and bear arms while present
in the Commonwealth: they remain at the mercy of Defendants' persistent delays
that consistently fall woefully short of the mark according to the Commonwealth's
own standards purportedly designed to ensure reasonable processing timetables.

160.    Again, affording the Commonwealth greatest degree of deference to its
own policies for policing firearms-related activity through a licensing process, and
assuming without conceding that the standards for license processing established
under the Commonwealth's licensing scheme would—if actually observed—pass
constitutional muster under the Second Amendment, *at the very least*, it must be said
that Defendants must actually adhere to those standards to avoid being liable for a
constitutional violation of non-residents' Second Amendment rights. The flipside of
the same coin is that if Defendants fail or refuse to adhere to their own baseline
standards, then the licensing requirements cannot and should not be enforced.

161.    Situations like this are not tolerated with other constitutional rights. In
the free speech context, an individual "faced with such an unconstitutional licensing
law may ignore it and engage with impunity in the exercise of the right of free
expression for which the law purports to require a license." *Shuttlesworth v. City of
Birmingham*, 394 U.S. 147, 151 (1969). The Constitution forecloses conditioning the
exercise of rights on lengthy waiting periods. *See, e.g.*, *Rogers v. Hacker*, 2023 WL
5529812, at *8 (S.D. Ill. Aug. 28, 2023) (finding that a waiting period of five months
for a firearm owners ID card constituted a concrete injury); *Memorial Hospital v.*

-

*Maricopa County*, 415 U.S. 250, 263-64 (1974) (an Arizona statute imposing a one-year waiting period for new residents to become eligible for state medical assistance impermissibly interfered with the constitutional right to freedom of interstate immigration); *Cooper v. Aaron*, 358 U.S. 1, 7 (1958) (addressing public school delays in implementing racial integration, the Court held that a "delay in any guise in order to deny . . . constitutional rights . . . could not be countenanced," but rather "only a prompt start, diligently and earnestly pursued . . . could constitute good faith compliance.") The same principle should apply here, as Second Amendment is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald*, 561 U.S. at 780; *accord Bruen*, 597 U.S. at 70.

162.   For the same reason, to the extent that this scheme continues to be enforced, from a constitutional perspective, Defendants not only must *minimally* ensure that they consistently meet the statutorily-prescribed standards purportedly intended to ensure sufficiently reasonable processing times, but they must also extend to non-residents the same grace period extended to residents. That is the only way to ensure non-residents are not forced into a state of legal purgatory during the period between the date of expiration and the date their LTCs are actually renewed; otherwise, they are subject to the same prohibitions as an unlicensed person and therefore disabled from exercising their right to keep and bear arms throughout the period following expiration and before renewal of their licenses based on no fault of their own.

163.   Beyond that, to ensure *reasonable* application processing times—*at a minimum*, meeting the Commonwealth's own statutory standards—and thus to ensure the ability of non-residents to obtain and maintain their right to keep and bear arms in Massachusetts, the following changes are minimally necessary:

- The period of validity of a non-resident LTC should be extended from one year to six years, simply aligning with the validity period of resident LTCs and avoiding the need for non-residents to renew their licenses every year through a system that is clearly inadequate or inept to handle the volume of renewal applications being submitted every year.

- 

- Non-residents should be able to satisfy the "in-person" interview requirement through an online platform, such as Zoom, to avoid the need for them to travel great distances and consume significant time and resources to appear in person at the FRB in Chelsea, Massachusetts. As the situation with Plaintiff Lawson exemplifies, this travel requirement can impose significant burdens that make it difficult, if not impossible, for non-residents to satisfy all the requirements necessary to obtain a non-resident LTC, thus deterring any application.

- The Commonwealth should establish certification procedures for the new "live-fire" component of the firearm safety training requirement that allow non-residents to complete and satisfy this requirement through instructors and courses within their home states, to avoid the need for non-residents to undertake burdensome and potentially cost-prohibitive travel to and from Massachusetts for such training.

164.    Indeed, precedent exists for requiring Defendants to modify their existing scheme to reasonably accommodate the ability to obtain and maintain the LTCs necessary to keep and bear arms within Massachusetts. In *CRPA v. L.A. County Sheriff's Department*, 745 F.Supp.3d 1037 (C.D. Cal. 2024), the district court granted an injunction against the operation of California's concealed carry licensing scheme insofar as necessary to afford non-residents the ability to obtain and maintain such licenses while present in California (the scheme flatly denied them such licenses). Thereafter, the court issued an order entering the injunction, which set forth specific terms and conditions designed to implement the order. Dkt. No. 81 (Jan. 22, 2025), Case No. 2:23-cv-10169. Among these were terms and conditions, the court ordered that California must allow non-residents to complete any live-fire component of the firearm safety training requirement within their home states and that it must allow non-residents to complete the interview requirement "virtually in lieu of in person, so long as the applicant appears by video and audio." *Id.* at 3-4.

165.    As it stands now however, Defendants here have been enforcing and are continuing to enforce this licensing scheme against non-residents *notwithstanding*

the significant delays that violate their own statutory standards and *notwithstanding* the absence of any grace period to protect non-residents against the criminal liability to which they being exposed in attempting to renew their LTCs in order to simply maintain this state-mandated "permission" to exercise their fundamental rights— liability to which they are being exposed on account of Defendants' conduct in failing or refusing to process LTC applications timely enough to prevent lapsing.

166.    No historical precedent—much less an enduring "tradition" with roots at the Founding—exists for constraining and restraining the free exercise of rights through a licensing scheme like that of the Commonwealth, which not only conditions the right to keep and bear arms on strict compliance with the scheme—as if the exercise of this right is a matter of legislative grace—but which then subjects renewal applicants to inordinate delays in both obtaining and maintaining the license.

167.    Therefore, Defendants' enforcement of this licensing scheme has violated the constitutional rights of Individual Plaintiffs and the similarly situated members of Institutional Plaintiffs, and it will continue to violate those rights of all such individuals unless and until they obtain the relief sought through this action.

**COUNT II**
**CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF**
**U.S. CONST. AMEND. XIV**
**EQUAL PROTECTION**
**42 U.S.C. § 1983**

168.    Plaintiffs incorporate herein by reference the foregoing paragraphs as if fully set forth herein.

169.    Separately from Plaintiffs' Second Amendment claim, the United States Supreme Court has consistently held that regulations and classifications that impose a penalty or an impermissible burden on the right to travel violate the Equal Protection Clause of the Fourteenth Amendment, unless absolutely necessary to promote a compelling government interest. *Saenz v. Roe*, 526 U.S. 489, 499 (1999); *Shapiro v. Thompson*, 394 U.S. 618, 634 (1969).

170.   "Freedom to travel throughout the United States has long been recognized as a basic right under the Constitution." *Dunn v. Blumstein*, 405 U.S. 330, 338 (1972). "A state law implicates the right to travel when it actually deters such travel, ... when impeding travel is its primary objective, ..., or when it uses 'any classification which serves to penalize the exercise of that right." *Attorney Gen. of New York v. Soto-Lopez*, 476 U.S. 898, 903 (1986) (citations omitted). "The right to travel is an 'unconditional personal right,'" a right whose exercise may not be conditioned." *Dunn*, 405 U.S. at 341 (citation omitted).

171.   As the petitioners in the matter of *Marquis v. Commonwealth of Massachusetts* put it in their petition for a writ of certiorari challenging the constitutionality of this scheme, Supreme Court Docket No. 24A1180, at pp. 9-10, "the penalty incurred by the nonresident traveler is two-fold. If an otherwise law-abiding person travels into Massachusetts with a firearm, without a discretionary license, then that person must suffer disarmament, arrest and/or prosecution an,d become exposed to an eighteen-month mandatory minimum sentence. If that person does not wish to meet this fate, then the person must relinquish the firearm prior to travel and thereby yield his or her Second Amendment rights."

172.   Indeed, Massachusetts' policy of denying non-residents the same grace period that it extends to residents seeking to renew their LTCs in order to simply *maintain* the ability to *consistently* lawfully exercise their constitutionally protected right to keep and bear arms while present in the Commonwealth by itself inhibits the free interstate passage of citizens and violates equal protection doctrines, by treating Americans differently merely on account of their state of residency.

173.   "Since the classification here touches on the fundamental right of interstate movement, its constitutionality must be judged by the stricter standard of whether it promotes a *compelling* state interest." *Shapiro v. Thompson*, 394 U.S. 618, 638 (1969). "Where activities or enjoyment, natural and often necessary to the well-being of an American citizen, such as travel, are involved, we will construe narrowly all delegated powers that curtail or dilute them." *Kent v. Dulles*, 357 U.S. 116, 129 (1958).

-

174.    It cannot be seriously maintained that depriving non-residents of this grace period certainly is necessary to promote a compelling government interest or even at all appropriate in advancing any legitimate purpose. Such a grace period is only necessary in the first instance because (a) the Commonwealth generally conditions the right to keep and bear arms on strict compliance with a licensing scheme and (b) Defendants consistently fail or refuse to comply with their statutorily-mandated standards purportedly intended to ensure reasonable processing times. Moreover, Defendants' own policies and practices publicly declare and admit that non-residents are, as a matter of course, subject to longer processing times than residents, https://shorturl.at/for3d. It makes no sense, constitutionally or logically, to deprive non-residents of the grace period when the frequency and extent of delays resulting in lapsed licenses are substantially *greater than* what residents experience.

175.    Instead, to deny non-residents this grace period by writing them out of the statutory protection afforded to residents can only smack of disparate and disfavored treatment based on the mere fact that they are not residents.

176.    Defendants' enforcement of the current licensing scheme violates the equal protection rights of non-residents in similarly impermissible ways: by requiring them to renew their LTCs every year, instead of every six years like residents, the Commonwealth is forcing them to incur application fees six times higher and to submit to the generally burdensome renewal process six times as often; and by requiring all first-time applicants to appear for an in-person interview at the FRB, Defendants are forcing non-residents to expend potentially significant time and resources to leave behind their families and jobs to travel to and from Chelsea. Such requirements inherently impose significant burdens on non-residents, yet without any reasonable or even discernable government interest that would justify the same.

177.    Therefore, Defendants have violated and are continuing to violate the Equal Protection Clause of the Fourteenth Amendment through their enforcement of this licensing scheme that impermissibly burdens the right to travel and free interstate passage of American citizens who happen not to be residents of

37

-

Massachusetts but who are equally entitled to exercise the right to keep and bear arms while there.

**COUNT III**
**CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF**
**U.S. CONST. ART. IV, § 2**
**PRIVILEGES AND IMMUNITIES CLAUSE**
**42 U.S.C. § 1983**

178.    Plaintiffs incorporate herein by reference the foregoing paragraphs as if fully set forth herein.

179.    Plaintiffs also separately challenge Defendants' enforcement of the licensing scheme under the Privileges and Immunities Clause of Article IV, § 2 of the United States Constitution. This provision declares that "the Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several states." It bars discrimination against citizens of other states based on their status as a citizen of another state. *Toomer v. Witsell*, 334 U.S. 385, 396 (1948). More specifically, the provision is designed to remove "from the citizens of each State the disabilities of alienage in the other States." *Saenz v. Roe*, 526 U.S. at 501-502 (quoting *Paul v. Virginia*, 8 Wall. 168, 180 (1868)). It serves "to outlaw classifications based on the fact of non-citizenship unless there is something to indicate that non-citizens constitute a peculiar source of the evil at which the statute is aimed." *Toomer* at 398.

180.    As discussed above, no legitimate government interest exists that could or would justify, constitutionally or logically, denying non-resident the same grace period afforded to residents as part of the renewal process. This is particularly true when Defendants have been actively perpetuating substantial delays in the licensing process that are resulting in lapses between the expiration date and renewal date. Defendants know full well the significant ramifications of such lapses in the absence of any exception—an effective prohibition on the exercise of otherwise constitutionally-protected rights—which is the whole reason why a grace period exists. That Defendants would knowingly perpetuate such a scheme in derogation of the constitutional liberties of non-residents, whose right to keep and bear arms in Massachusetts is effectively suspended throughout any period of lapse between

-

expiration and renewal, can only suggest that the scheme is designed to impose a disability against non-residents who cannot be said to "constitute a peculiar source of the evil at which the statute is aimed." *Toomer v. Witsell*, 334 U.S. at 396.

181.    The same is true with the other disparately burdensome conditions placed on non-residents: having to travel to Chelsea, Massachusetts for the "in-person" interview, no matter how far away they live, and being subjected to the renewal process six times as often, not only forcing them to incur six times the application fees but also exposing them to more frequent or extended lapses in the validity of their LTCs without any grace period to insulate them during the process.

182.    Therefore, Defendants have violated and are continuing to violate the Privileges and Immunities Clause of Article IV, § 2 of the United States Constitution, through their enforcement of this licensing scheme that creates an unlawful classification for non-residents based solely on their non-citizenship.

## PRAYER

WHEREFORE, Plaintiffs pray for the following relief:

1.    Declare that Defendants' enforcement against Individual Plaintiffs and all similarly situated members and supporters of Institutional Plaintiffs of law-abiding adults of M.G.L.A. 140 § 131F, and all implementing regulations, declarations, and policies, which individually and/or collectively have the effect of unreasonably or excessively delaying the ability of these non-residents to obtain a Massachusetts-issued LTC and the effect of unreasonably or excessively delaying or interrupting the ability of these non-residents to maintain the previously issued LTCs, violates the right of these non-residents to keep and bear arms under the Second and Fourteenth Amendments to the United States Constitution;

2.    Declare that Defendants' enforcement against Individual Plaintiffs and all similarly situated members and supporters of Institutional Plaintiffs of law-abiding adult of M.G.L.A. 140 §§ 121F(o)(i), 131(b), 131P(a)-(c), 131F, and all implementing regulations, declarations, and policies, which individually and/or collectively have the effect of impermissibly burdening the right to travel and free

interstate passage of non-residents seeking to obtain and maintain a Massachusetts LTC, violate the Equal Protection Clause of the Fourteenth Amendment.

3.    Declare that Defendants' enforcement against Individual Plaintiffs and all similarly situated members and supporters of Institutional Plaintiffs of law-abiding adult of M.G.L.A. 140 §§ 121F(o)(i), 131(b), 131P(a)-(c), 131F, and all implementing regulations, declarations, and policies, which individually and/or collectively have the effect of impermissibly drawing classifications and imposing disabilities of alienage against non-residents based on their mere status as non-citizens, violate the Privileges and Immunities Clause of Article IV, § 2 of the United States Constitution;

4.    Permanently enjoin all the Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them and all who have notice of the injunction from enforcing the restrictions in M.G.L.A. 140 §§ 121F(o)(i), 131(b), 131P(a)-(c), and 131F and all implementing regulations, declarations, and policies against Individual Plaintiffs and all similarly situated members and supporters of Institutional Plaintiffs;

5.    In the alternative to the injunction requested in section 4 of the Prayer, *supra*, declare the above-referenced statutory provisions, and all implementing regulations, declarations, and policies, enforceable only on the conditions that:

(a)    The period of non-resident LTC is aligned with the period of validity for resident LTCs pursuant to M.G.L.A. 140 § 131(e);

(b)    Non-residents are permitted to satisfy the "in-person" interview requirement through an online platform, such as Zoom;

(c)    Non-residents are permitted to complete and satisfy the new "live-fire" component of the firearm safety training requirement through instructors and courses within their home states; and

(d)    Such other conditions as may be necessary to ensure reasonable processing times of first-time and renewal LTC applications which, at a minimum, meet the Commonwealth's own statutory standards for processing first-time and renewal applications.

6.     Attorneys' fees;

7.     Costs; and

8.     Any such further relief that the Court deems just and equitable.


DATED: August 11, 2025

Respectfully submitted, the Plaintiffs,

*/s/ Jason A. Guida, Esq,*
Jason A. Guida (BBO# 667252)
2nd Amendment Legal
76 Winn Street, Ste 1A
Woburn, MA 01801
Office: (617) 383-4652
jason@lawguida.com

Raymond M. DiGuiseppe
The DiGuiseppe Law Firm, P.C.
116 N. Howe, Suite A
Southport, NC 28461
Office: (910) 931-0723
rmd@dlfpc.org
*Forthcoming application for Pro Hac Vice admission*


### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 13, 2025.

*/s/ Jason A. Guida, Esq,*
Jason A. Guida