**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **RUSSELL LAWSON, JR. et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**ANDREA JOY CAMPBELL, in her official capacity as Attorney General of the Commonwealth of Massachusetts, et al.,**<br><br>**Defendants.** | **Case No. 25-cv-12268-DJC** |

**MEMORANDUM AND ORDER**

**CASPER, C.J.** **August 28, 2026**

## I. Introduction

Plaintiffs Russell Lawson, Jr. ("Lawson"), Brian Burns ("Burns") and Christopher Penta ("Penta") (collectively, "Individual Plaintiffs"), together with the Second Amendment Foundation, Inc. ("SAF") and the Gun Owners Action League ("GOAL") (collectively, "Organizational Plaintiffs") (collectively, "Plaintiffs"), have filed this lawsuit against Defendants Andrea Joy Campbell, in her official capacity as Attorney General of the Commonwealth of Massachusetts, Terrence M. Reidy, in his official capacity as secretary of the Executive Office of Public Safety and Security of the Commonwealth of Massachusetts, Geoffrey Nobel, in his official capacity as Superintendent of the Massachusetts State Police and Jamison R. Gagnon, in his official capacity as Commissioner of the Massachusetts Department of Criminal Justice Information Services (collectively, "Defendants"), alleging that delays in the Commonwealth's processing of a non-

resident license to carry firearms ("LTC"), *inter alia*, violate the Second and Fourteenth Amendments (Count I), the Equal Protection Clause of the Fourteenth Amendment (Count II), and the Privileges and Immunities Clause, or Art. IV, § 2 (Count III). D. 1. Defendants have now moved to dismiss with prejudice pursuant to Fed. R. Civ. P 12(b)(1) and Fed. R. Civ. P. 12(b)(6). D. 8. For the reasons stated below, the Court DENIES the motion under Fed. R. Civ. P 12(b)(1). Id. The Court also DENIES the motion under Fed. R. Civ. P. 12(b)(6) as to Plaintiffs' as-applied claim in Count I and as to Count II in its entirety, and ALLOWS same as to Plaintiffs' facial claim in Count I and as to Count III in its entirety. Id.

## II. Standard of Review

When confronted with a Rule 12(b)(1) motion, "the district court must construe the complaint liberally, treating all well-pleaded facts as true and indulging all reasonable inferences in favor of the plaintiff." Aversa v. United States, 99 F.3d 1200, 1209-10 (1st Cir. 1996) (citing Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995)). "[T]he party invoking the jurisdiction of a federal court carries the burden of proving its existence." Murphy, 45 F.3d at 522 (quoting Taber Partners, I v. Merit Builders, Inc., 987 F.2d 57, 60 (1st Cir. 1993)). Standing is a jurisdictional issue, see P.R. Tel. Co. v. T-Mobile P.R. LLC, 678 F.3d 49, 57 (1st Cir. 2012), and, accordingly, challenges to standing are properly considered under Rule 12(b)(1), see Kolancian v. Snowden, 532 F. Supp. 2d 260, 261 (D. Mass. 2008).

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), the Court must determine if the facts alleged "plausibly narrate a claim for relief." Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (citation omitted). Reading the complaint "as a whole," the Court must conduct a two-step, context-specific inquiry. García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013). First, the Court must perform a close reading of the claim to distinguish the factual allegations from the conclusory legal

allegations contained therein. Id. Factual allegations must be accepted as true, while conclusory legal conclusions are not entitled credit. Id. Second, the Court must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the conduct alleged." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (internal quotation marks and citation omitted). In sum, the complaint must provide sufficient factual allegations for the Court to find the claim "plausible on its face." García-Catalán, 734 F.3d at 103 (internal quotation marks and citation omitted).

**III. Factual Allegations**

The following facts are drawn from the complaint, D. 1, and are accepted as true for the purpose of resolving the motion to dismiss.

**A. Regulatory Background**

A non-resident of the Commonwealth who does not possess a LTC but who does possess "a permit, card or license issued from their state of residence which has substantially similar requirements to those of the [C]ommonwealth," D. 1 ¶ 123 (internal quotation marks omitted) (quoting Mass. Gen. L. c. 140, § 129C(i)), may only possess firearms in the Commonwealth for specified purposes: (1) to hunt, (2) while on a shooting range, (3) while traveling in or through the Commonwealth (provided that the firearm remains unloaded and in a locked container) or (4) at a firearm show organized by a regularly existing gun collectors' club, see id. (citing Mass. Gen. L. c. 140, § 129C(j)). Such firearms cannot be large capacity or semi-automatic. See id.

A non-resident seeking to carry a firearm beyond these restrictions must obtain a temporary (one-year) LTC from the colonel of the state police. Id. ¶¶ 124-26 (citing Mass. Gen. L. c. 140, § 131F). The applicant must be suitable and must not be a "prohibited person." Id. ¶ 125 (internal quotation marks omitted) (quoting Mass. Gen. L. c. 140, § 131F). Non-resident LTCs differ from

resident LTCs, in that (1) resident LTCs last for six years at a time, while non-resident LTCs typically last for one-year periods, id. ¶ 126, and (2) resident LTCs allow for a grace period for lapses between licenses that is not available to non-residents, id. (citing Mass. Gen. L. c. 140, § 121F(s)(i)-(iii)).

Applying for an LTC is a multi-step process for residents and non-residents alike. Id. ¶ 127. Applicants must: (1) pay a $100 fee for any new or renewal application, id. ¶ 128 (citing Mass. Gen. L. c. 140, § 121F(o)(i)), (2) submit their application via the standard form provided by the commissioner of the Department of Criminal Justice Information Services, (3) which requires every new applicant to appear in-person at the Firearms Records Bureau (the "FRB") in Chelsea, Massachusetts, id. ¶¶ 129-30 (citing Mass. Gen. L. c. 140, § 121F(g)), and (4) undergo fingerprint background checks annually, id. ¶ 131 (citing Mass. Gen. L. c. 140, § 131F). New applicants must also generally complete a Massachusetts Basic Firearms Safety Course ("BFS") and provide a certificate of their completion. Id. ¶ 132 (citing Mass. Gen. L. c. 140, §§ 131(b), 131(P)(a)). Additionally, a "live fire" training requirement for both new and renewal applicants became effective in October 2024 but has not yet been implemented. Id. ¶ 133 & n.6.

The timeline for processing LTC applications is provided by Mass. Gen. L. c. 140, § 121F. Id. ¶ 134. Upon receiving the application, the licensing authority must provide the applicant with a receipt documenting, *inter alia*, the date it was received. Id. (citing Mass. Gen. L. c. 140, § 121F(b)). Within seven days of receipt, the licensing authority must forward a copy of the application and the applicant's fingerprints to the colonel of the state police. Id. (citing Mass. Gen. L. c. 140, § 121F(c)). Within thirty days of receipt of the application and fingerprints, the colonel of the state police must advise the licensing authority of any reason for disqualification of the applicant or certify the lack thereof. Id. (citing Mass. Gen. L. c. 140, § 121F(d)). The licensing

authority then must approve or deny the application "within 40 days" from the date of its receipt. Id. (internal quotation marks omitted) (quoting Mass. Gen. L. c. 140, § 121F(a)). The state website provides that non-resident LTC processing may take up to ninety days. Id. ¶ 136.

### B. Factual Allegations Specific to Individual Plaintiffs

Lawson, Burns, and Penta live out-of-state but frequently visit the Commonwealth. D. 1 ¶¶ 14-15, 34-35, 58-59. Lawson is a first-time applicant seeking to obtain an LTC, while Burns and Penta have both previously obtained LTCs and have faced delays in the renewal process. Id. ¶ 3.

Lawson is a resident of Queens, New York. Id. ¶ 14. He owns property and a hunting cabin in Lanesborough, Massachusetts, which he visits over weekends and for one or two weeks in the summer. Id. ¶ 15. He has lawfully possessed and used firearms in other states. Id. ¶ 17. In January 2025, Lawson applied for a non-resident LTC. Id. ¶ 23. On or around January 29, 2025, the FRB confirmed receipt of his application and scheduled his in-person interview in the morning of June 9, 2025, in Chelsea, Massachusetts, the earliest possible date. Id. ¶¶ 24-25. Lawson confirmed that he would attend. Id. ¶ 27. On the day, he was unable to make the appointment due to unexpected, time-sensitive work obligations as well as his lack of paid time off. Id. ¶ 29. About two days after June 9, Lawson asked that his appointment be rescheduled. Id. ¶ 30. The FRB rescheduled to the earliest available date, October 20, 2025. Id. ¶¶ 31-32. On October 22, 2025, the FRB requested additional information regarding an out-of-state criminal charge that Lawson failed to disclose in his LTC application. D. 9-1¶ 7.[1] At the motion hearing, both Defendants' and Plaintiffs' counsel represented that Lawson received his LTC on March 3, 2026.

[1] Defendants appended the declaration of the Deputy Commissioner of the Department of Criminal Justice Information Services to their motion to dismiss, D. 9-1, on the basis that the "additional facts presented in the affidavit . . . are relevant to Defendants' claim of mootness," D. 9

Burns is a resident of Miromar Lakes, Florida and has a residence in East Falmouth, Massachusetts, where he typically stays from July to November each year. D. 1 ¶¶ 34-37. He has lawfully possessed and used firearms in other states. Id. ¶ 39. Burns has had at least four Massachusetts-issued non-resident LTCs. Id. ¶ 42. While Burns has timely applied for renewal each year, delays in the process have led to lapses in his licensure. Id. ¶¶ 46-47; see e.g., id. ¶ 48 (alleging that, at least once, his LTC application was "delayed to the point that the renewal was not issued until almost six months after the date of expiration").

Penta is a resident of Hampstead, New Hampshire and has frequently traveled to and within the Commonwealth for work obligations and family visits since about 2018. Id. ¶¶ 58-59. He has lawfully possessed and used firearms in other states. Id. ¶ 62. Penta has maintained a non-resident LTC in the Commonwealth since 2018. Id. ¶ 64. While Penta has timely applied for renewal each year, delays in the process have led to lapses in his licensure. Id. ¶¶ 69-84; see e.g., id. ¶ 71 (alleging that "processing was delayed to the point that the renewal was not issued until almost two months after the expiration date").

Lawson, Burns and Penta are members of SAF and GOAL, non-profit organizations focused on the Second Amendment. Id. ¶¶ 33, 57, 85.

**IV. Procedural History**

Plaintiffs instituted this action on August 13, 2025. D. 1. Defendants have now moved to dismiss. D. 8. The Court heard the parties on the pending motion and took the matter under advisement. D. 16.

---

at 9 n.7. The Court agrees and, accordingly, the Court has considered it here. See Gonzalez v. United States, 284 F.3d 281, 288 (1st Cir. 2002) (providing that "[w]hile the court generally may not consider materials outside the pleadings . . . it may consider such materials on a Rule 12(b)(1) motion").

## V. Discussion

In essence, Plaintiffs' claims are twofold: a facial challenge to certain features of the Massachusetts licensing regime, including the period of validity of the LTCs that are issued to non-residents of Massachusetts, the absence of grace period for same, and certain requirements (e.g., in-person fingerprinting/interview requirement, firearm safety course) and an as-applied challenge in the form of the alleged processing delays that Individual Plaintiffs have encountered. The Court turns first to Defendants' challenge to Plaintiffs' standing and then to their assertion that each of the three counts fail to state a claim.

### A. Motion to Dismiss Under Fed. R. Civ. P. 12(b)(1)

Defendants move to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of standing. D. 8; D. 9 at 12-17. To establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief. If 'the plaintiff does not claim to have suffered an injury . . . there is no case or controversy for the federal court to resolve.'" TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021) (internal citation omitted) (quoting Casillas v. Madison Ave. Assocs., Inc., 926 F.3d 329, 333 (7th Cir. 2019)).

#### 1. *Individual Plaintiffs Have Standing to Mount a Facial Challenge to Massachusetts' Shall-Issue Licensing Regime*

##### a) Delays Suffice to Establish Injury Under Fed. R. Civ. P. 12(b)(1)

Defendants argue that Individual Plaintiffs lack standing to bring a facial challenge because none of Individual Plaintiffs' LTC applications have been denied, such that no injury exists. D. 9 at 14-15. Plaintiffs disagree and argue that they have been injured by delays in the LTC application process, which they contend effectively deny licensure during periods of lapse. D. 13 at 11-13.

Defendants rely upon Libertarian Party of Erie Cnty. v. Cuomo, 970 F.3d 106, 116 (2d Cir. 2020), abrogated by New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1, 142 (2022) ("Bruen"), which provides that, to mount a facial challenge to a firearm licensing regime, "a person must either have applied for and been denied a license or make a 'substantial showing' that his or her application 'would have been futile,'" id. (quoting United States v. Decastro, 682 F.3d 160, 164 (2d Cir. 2012)); see D. 9 at 14. This Circuit has also recognized such alleged harm as an Article III injury for the purposes of standing. Hightower v. City of Bos., 693 F.3d 61, 70 (1st Cir. 2012).

While Individual Plaintiffs' LTC applications were ultimately allowed, they have still plausibly alleged Article III injury. First, "as Bruen indicates, sufficiently 'lengthy wait times,'" as alleged here, "can themselves be concrete constitutional injuries." Giambalvo v. Suffolk Cnty., New York, 155 F.4th 163, 183 (2d Cir. 2025) (quoting Bruen, 597 U.S. at 39 n.9). Indeed, administrative delays can and do suffice to establish an injury for purposes of Fed. R. Civ. P. 12(b)(1) across contexts. See, e.g., RENEW Ne., et al. v. United States Dep't of Interior, et al., 25-cv-13961-DJC, 2026 WL 1078282, at *11 (D. Mass. Apr. 21, 2026) (reasoning that plaintiffs adequately alleged injury where delays in renewable energy development caused by administrative memorandum caused economic harm); Victim Rts. L. Ctr. v. Cardona, 552 F. Supp. 3d 104, 123 (D. Mass. 2021) (explaining that "the delay" in scheduling individual plaintiff's hearing pursuant to Title IX "[wa]s an injury in and of itself"). Second, Plaintiffs contend that the delays, coupled with the lack of grace period, the annual re-application requirement, and the other challenged features of the LTC regime, render nonresidents unable to carry firearms for prolonged periods "on pain of criminal penalty." D. 13 at 12. Because the inability to "carry a firearm legally in public for the cognizable interest of personal self defense" constitutes a concrete and particularized

injury, Davis, 9 F. Supp. 3d at 23, Plaintiffs have sufficiently alleged that their LTC applications are effectively denied during such periods.

In light of the foregoing, the Court concludes that Individual Plaintiffs have adequately alleged an injury to bring a facial challenge to the Commonwealth's LTC regime.

b) Individual Plaintiffs' Claims Are Ripe

Defendants next argue that Individual Plaintiffs' claims are not ripe because their allegations that the delays will recur in future are speculative. D. 9 at 15. "[T]he Supreme Court has reinforced that [the] ripeness doctrine seeks to prevent the adjudication of claims relating to 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" Reddy v. Foster, 845 F.3d 493, 500 (1st Cir. 2017) (quoting Texas v. United States, 523 U.S. 296, 300 (1998)). Ripeness involves a two-pronged inquiry: (1) fitness and (2) hardship. Id. at 501. Fitness has both a jurisdictional component, id. (defining same as "whether there is a sufficiently live case or controversy, at the time of the proceedings, to create jurisdiction in the federal courts" (internal quotation marks and citation omitted)), and a prudential component, id. (defining same as "whether resolution of the dispute should be postponed in the name of judicial restraint from unnecessary decision of constitutional issues" (internal quotation marks and citation omitted)). Hardship simply "concerns the harm to the parties seeking relief that would come to those parties from [the court's] withholding of a decision at this time." Id. (internal quotation marks and citation omitted)).

Defendants first argue that it is uncertain whether Individual Plaintiffs will be subject to similar delays in future, such that their claims are speculative. D. 9 at 15. Turning to the allegations in the complaint, Lawson and Burns own property in Massachusetts, D. 1 ¶¶ 15, 36, and all three Individual Plaintiffs allege that they frequently visit the Commonwealth, id. ¶¶ 15,

37, 59. Burns and Penta have already held multiple non-resident LTCs in Massachusetts, id. ¶¶ 42, 64, and both allege that their renewal applications have been delayed despite their good-faith efforts, id. ¶ 8. All three Individual Plaintiffs "desire[] to lawfully own, possess, and use firearms" in Massachusetts. Id. ¶ 19, 43, 66. Plaintiffs further allege that there is no grace period for nonresidents, id. ¶ 126, and that the non-resident LTC must be renewed every year, id. Taken together, the Court cannot say, as Defendants contend, D. 9 at 15, that "[w]e have no idea whether or when" another injury will occur, Reddy, 845 F.3d at 505 (internal quotation marks and citation omitted), or that recurrence is "merely speculative," Libertarian Party, 970 F.3d at 116. Rather, Plaintiffs have alleged, on the basis of the statutory structure and their alleged needs to continue applying for non-resident LTCs, that their injuries are likely to recur annually. Such allegations are sufficient to establish that there is a live case or controversy under the jurisdictional component of the ripeness analysis.

To the extent that Defendants contest that Plaintiffs have failed to allege "any cognizable harm" stemming from recurring delays, D. 9 at 15, Plaintiffs have alleged that the delays expose them to criminal penalties during periods of lapse, see, e.g., D. 1 ¶ 150, and because "plaintiffs need not 'first expose [themselves] to actual arrest or prosecution to be entitled to challenge [the] statute that [they] claim deters the exercise of [their] constitutional rights,'" Davis, 9 F. Supp. 3d at 23 (alterations in original) (quoting Steffel v. Thompson, 415 U.S. 452, 459 (1974)), the Court concludes that Plaintiffs have sufficiently alleged hardship under the second prong of the ripeness analysis, cf. O'Connell v. Walsh, 15-cv-10096-DJC, 2015 WL 9581735, at *2-3 (D. Mass. Dec. 30, 2015) (determining that plaintiff failed to establish hardship for purposes of standing where plaintiff failed to apply for a license, let alone be denied a license).

In light of the foregoing, the Court declines to dismiss Plaintiffs' facial challenge to the LTC scheme for non-residents.

2. *Individual Plaintiffs Have Standing to Bring an As-Applied Challenge*

Because Burns and Penta have received their renewed LTCs, and Lawson's application was "paused" on account of his prior criminal history before being granted in March 2026, Defendants argue that Individual Plaintiffs' claims are moot. D. 9 at 16-17; D. 9-1 at ¶¶ 5-7. Plaintiffs counter that Defendants' motion admits their "failure or refusal to abide" by statutory timelines, underscoring the "need" for judicial intervention and, in the alternative, claim exceptions to the mootness doctrine. D. 13 at 16-19.

"The doctrine of mootness enforces the mandate 'that an actual controversy must be extant at all stages of the review, not merely at the time the complaint is filed.' Am. C.L. Union of Massachusetts v. U.S. Conf. of Cath. Bishops, 705 F.3d 44, 52 (1st Cir. 2013) (internal citations omitted) (quoting Mangual v. Rotger–Sabat, 317 F.3d 45, 60 (1st Cir. 2003)). A case is moot when "the court cannot give any 'effectual relief' to a potentially prevailing party." Id. (quoting Horizon Bank & Trust Co. v. Massachusetts, 391 F.3d 48, 53 (1st Cir. 2004)). In other words, if an opinion has been rendered "merely advisory, Article III considerations require dismissal." Id. at 52-53 (internal quotation marks and citation omitted).

It is correct that, even as alleged, none of the Individual Plaintiffs currently have pending applications impacted by administrative delays, such that the Court cannot afford immediate relief from same. D. 9-1 ¶¶ 5-7. Nonetheless, the Court agrees with Plaintiffs that the alleged delays fall "within the exception for controversies that are capable of repetition, yet evading review," D. 13 at 17 (internal quotation marks and citation omitted). Certainly, this exception to the mootness doctrine "applies only in exceptional situations" where a plaintiff alleges that "(1) the

challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." Am. C.L. Union of Massachusetts, 705 F.3d at 57 (internal quotation marks and citation omitted). The party arguing for the exception bears the burden of demonstrating its applicability. In re Ruiz, 83 F.4th 68, 74 (1st Cir. 2023).

As to the first prong, although Plaintiffs' claims are "not among the inherently transitory claims the Supreme Court has recognized as likely to evade review," Am. C.L. Union of Massachusetts, 705 F.3d at 57 (internal quotation marks and citations omitted) (collecting examples, such as "elections," "pregnancies" and "temporary restraining orders"), the delays alleged here—e.g., 95 days and 287 days of processing time, 131 and 101 days to have an initial interview, D. 9 at 22 (citing complaint)—span months, not years, and, therefore, are too short to be resolved by litigation, see Wallingford v. Bonta, 82 F.4th 797, 801 (9th Cir. 2023) (explaining that, "[t]hough there is no bright-line rule, when assessing the classes of cases inherently limited in duration, . . . actions lasting less than two years are considered too short"); People for the Ethical Treatment of Animals, Inc. v. United States Fish & Wildlife Serv., 59 F. Supp. 3d 91, 97 (D.D.C. 2014) (same). As to the second prong, the Court concluded that Plaintiffs have alleged a "demonstrated probability" that Individual Plaintiffs will be subjected to processing delays in future, Am. C.L. Union of Massachusetts, 705 F.3d at 57 (internal quotation marks and citation omitted), and there is a "reasonable expectation" that Individual Plaintiffs will be subjected to delays again, id.; In re Ruiz, 83 F.4th at 74 (internal quotation marks and citation omitted). In light of the foregoing, Plaintiffs' as-applied claims fall within this exception to the mootness doctrine.

In sum, Plaintiffs' have plausibly alleged standing to bring an as-applied challenge to the Commonwealth's LTC regime.[2]

*3. Organizational Plaintiffs Also Have Standing*

Defendants argue that Organizational Plaintiffs lack standing to bring either a facial or as-applied challenge. D. 9 at 12, 15-17. Defendants further argue that SAF, on its own, lacks standing to bring a facial challenge because the organization has failed to allege an injury traceable to Defendants' conduct. Id. at 15-16. In opposition, Organizational Plaintiffs assert associational standing, derived from Individual Plaintiffs, as well as SAF's "standing to bring this action on behalf of itself." D. 13 at 13-15.

"Associational standing allows an organization to sue on behalf of its members when '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" Am. Ass'n of Univ. Professors v. Rubio, 780 F. Supp. 3d 350, 375 (D. Mass. 2025) (quoting Hunt v. Washington State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977)). Here, the Individual Plaintiffs are parties to this lawsuit and members of the Organizational Plaintiffs, D. 1 ¶¶ 33, 57, 85, and the Court has determined that Individual Plaintiffs have standing to mount both a facial challenge and an as-applied challenge. Organizational Plaintiffs also allege that they seek to protect interests germane to their purpose. Id. ¶ 91, 98. Organizational Plaintiffs, therefore, have associational standing. Am. Ass'n of Univ. Professors, 780 F. Supp. 3d at 375. Because "the Organizational Plaintiffs have associational standing[,] . . . the Court does not reach [SAF's] arguments regarding direct

---

[2] Given the analysis above, the Court need not reach Plaintiffs' alternative voluntary cessation argument. D. 13 at 18-19.

standing." President & Fellows of Harvard Coll. v. United States Dep't of Health & Hum. Servs., 798 F. Supp. 3d 77, 114 (D. Mass. 2025).

### B. Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6)

#### *1. Second Amendment (Count I)*

Plaintiffs pose both a facial challenge and an as-applied challenge to the LTC regime under the Second Amendment (Count I). D. 1 ¶¶ 147-67.

"[T]he Second Amendment protects the right to keep and bear arms for the purpose of self-defense." McDonald v. City of Chicago, Ill., 561 U.S. 742, 749-50 (2010) (citing D.C. v. Heller, 554 U.S. 570, 635 (2008)). "Like most rights, though, the right secured by the Second Amendment is not unlimited." United States v. Rahimi, 602 U.S. 680, 690 (2024) (internal quotation marks omitted) (quoting Heller, 554 U.S. at 626). Under Bruen, "a court faced with a Second Amendment challenge to a firearm regulation must 'first consider whether the Second Amendment's plain text covers' the regulated conduct," United States v. Vizcaíno-Peguero, 175 F.4th 34, 37 (1st Cir. 2026) (quoting Ocean State Tactical, LLC v. Rhode Island, 95 F.4th 38, 43 (1st Cir. 2024)). If it does, "then 'the government bears the burden of demonstrating that the challenged regulation is consistent with this Nation's historical tradition of firearm regulation.'" Id. (quoting United States v. Minor, 165 F.4th 616, 621 (1st Cir. 2026)); see Wolford v. Lopez, 609 U.S. __, 146 S. Ct. 2032, 2047-50 (2026) (reiterating and applying two-step Bruen test).

Relevant here, "the Bruen Court [] indicated that the full two-step analysis did not apply to 'shall-issue' laws because these laws delay, but do not deny, licenses while states ensure that guns are being carried by law-abiding and responsible citizens." Beckwith v. Frey, 171 F.4th 560, 570 (1st Cir. 2026). Rather, Bruen provided that "shall-issue laws were presumptively constitutional

unless a challenger could show that they were abusive toward Second Amendment rights."[3] Id. at 570; see Maryland Shall Issue, Inc. v. Moore, 116 F.4th 211, 222 (4th Cir. 2024), cert. denied, 145 S. Ct. 1049 (2025); Antonyuk v. James, 120 F.4th 941, 985 n.32 (2d Cir. 2024), cert. denied, 145 S. Ct. 1900 (2025). Also relevant here, Bruen "d[id] not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing licensing applications . . . deny ordinary citizens their right to public carry." Bruen, 597 U.S. at 38 n.9. To overcome the presumption of constitutionality afforded to shall-issue regimes, a plaintiff must show that a shall-issue licensing law effectively denies the right to keep and bear arms. Maryland Shall Issue, Inc., 116 F.4th at 223. If a plaintiff "fails to rebut this presumption of constitutionality, the plaintiff's challenge to the 'shall-issue' licensing law fails at step one [of Bruen], with no requirement to conduct a historical analysis under step two" of same. Id. If a plaintiff succeeds in overcoming this presumption, however, the burden shifts to the government under step two of Bruen. Id.

*a. Plaintiffs' Facial Challenge Under the Second Amendment Fails*

"A facial challenge is the 'most difficult challenge to mount successfully.'" Satanic Temple, Inc. v. City of Bos., 111 F.4th 156, 168 (1st Cir. 2024) (quoting Rahimi, 602 U.S. at 693). "[I]t requires a [plaintiff] to establish that no set of circumstances exists under which the [challenged law] would be valid." Rahimi, 602 U.S. at 693 (internal quotation marks and citation omitted). "Such a challenge 'fails if the law is constitutional in at least some of its applications,'"

[3] The Court notes that the Supreme Court's recent decision in Wolford dealt with a separate set of issues than those in the present action, i.e., Hawaii's law "prohibit[ing] firearms on private property open to the public without the express and affirmative consent of the property owner," Wolford, 146 S. Ct. at 2040, not a shall-issue LTC regime, and that it, therefore, applied the two-step Bruen test without affording the challenged law the presumption of constitutionality, id. at 2047-50.

Satanic Temple, Inc., 111 F.4th at 168 (quoting Rahimi, 602 U.S. at 701 n.2), "not because of a party's particular circumstance," Gaspee Project v. Mederos, 482 F. Supp. 3d 11, 21 (D.R.I. 2020).

Here, Massachusetts' shall-issue regime is "presumptively constitutional." Ritrovato v. Donovan, 23-cv-10820-DJC, 2025 WL 777216, at *4 (D. Mass. Mar. 11, 2025). Plaintiffs argue that Defendants' "implementation and enforcement [of same] effectively [] *den*[*ies*] LTCs for nonresidents like Plaintiffs over substantial periods of time, through their admittedly inordinate delays in scheduling the initial in-person interviews and . . . in processing renewal applicants notwithstanding the lack of any grace period." D. 13 at 20. To bring a facial challenge, however, Plaintiffs must establish that "no set of circumstances exists" under which Massachusetts' LTC regime would be valid—a high bar, and one that Plaintiffs have not met. Rahimi, 602 U.S. at 693 (internal quotation marks and citation omitted). Even assuming that the challenged features of Massachusetts' LTC regime remain the same and the alleged delays persist, such delays would, in at least some circumstances, only "brief[ly] delay [] an individual's ability to carry[, which] does not amount to constitutional harm," even in the absence of a grace period. Frey v. City of New York, 157 F.4th 118, 141 (2d Cir. 2025); see Giambalvo, 155 F.4th at 184 (explaining that "a short delay does not violate an individual's Second Amendment rights"); see also Maryland Shall Issue, Inc., 116 F.4th at 227 (rejecting facial challenge to firearm licensing delays because, in part, "in some cases, the process for obtaining a handgun qualification license can take only a few days"); see also Commonwealth v. Marquis, 495 Mass. 434, 459 (2025) (denying facial challenge to Massachusetts' LTC regime where defendant "ha[d] not pointed to any evidence that the Commonwealth's processing times meaningfully hinder the ability of nonresidents to exercise their right to public carry in all circumstances"), cert. denied sub nom. Marquis v. Massachusetts, 223 L. Ed. 2d 520 (Jan. 12, 2026). Accordingly, Plaintiffs' facial challenge under the Second

Amendment fails to overcome the presumption of constitutionality afforded to Massachusetts' shall-issue regime and fails at step one of the Bruen analysis. The Court need not proceed to step two. See Maryland Shall Issue, Inc., 116 F.4th at 223.

Against this conclusion, Plaintiffs argue that their facial challenge is not barred by the 'no set of circumstances' test because the Commonwealth's licensing regime "omits safeguards which are clearly required by the Constitution," relying upon United States v. Shields, 522 F. Supp. 2d 317, 336 (D. Mass. 2007). D. 13 at 20 (internal quotation marks and citation omitted). The Court agrees with Defendants, however, that Shields is distinguishable. There, another session of this Court considered a "statutory scheme [that] permit[ted] deprivation of liberty [i.e., civil commitment] without a timely probable cause determination by a neutral decisionmaker." Shields, 522 F. Supp. 2d at 336. Because the challenged statutory scheme, *inter alia*, "fail[ed] to establish a clear deadline for when [a] commitment hearing must be held," id. at 334, the court determined that it "omit[ted] safeguards" required by the Constitution and "endorse[d] procedures" that violated the Fourth Amendment and Due Process Clause, id. at 336. In its reliance on same, Plaintiffs fail to contend with the fact that, first, unlike in the statutory scheme in Shields, the Commonwealth's shall-issue non-resident licensing regime does provide timelines for the LTC application process, D. 1 ¶¶ 134-37 (explaining statutory scheme); cf. Shields, 522 F. Supp. 2d at 334, and second, Plaintiffs here challenge processing delays that allegedly impinge upon their Second Amendment, not deprivation of liberty under the Fifth Amendment, cf. id. at 336. While Plaintiffs take issue with the "implementation and enforcement" of Massachusetts' statutory timelines, D. 13 at 21, their reliance upon Shields here is unpersuasive.

In light of the foregoing, Plaintiffs have failed to overcome the presumption that Massachusetts' LTC licensing regime is constitutional, such that their facial challenge under the

Second Amendment fails. Accordingly, the Court allows the motion to dismiss as to Count I insofar as Plaintiff asserts a facial challenge to the LTC licensing scheme.

*b. Plaintiffs' As-Applied Challenge Under the Second Amendment Survives*

In mounting an as-applied constitutional challenge, Plaintiffs must "demonstrate that the statute, as applied to *his or her particular situation*, violates constitutional principles." Gaspee, 482 F. Supp. 3d at 21 (emphasis in original) (internal quotation marks and citation omitted). "[A] shall-issue licensing scheme, which is otherwise constitutionally sound may still be 'subject of course to an as-applied challenge if a shall-issue licensing regime does not operate in that manner in practice.'" Ritrovato, 2025 WL 777216, at *4 (quoting Bruen, 597 U.S. at 81 (Kavanaugh, J., concurring)).

To overcome the presumption of constitutionality afforded to Massachusetts' LTC regime, Plaintiffs argue that Individual Plaintiffs' LTC applications were delayed for "lengthy" periods, stretching beyond the period provided by statute, D. 1 ¶ 161. Defendants respond by arguing that the alleged delays were not lengthy enough to implicate Bruen, 597 U.S. at 38 n.9, citing cases where delays were determined to be lengthy when they surpassed "eighteen months," California Rifle & Pistol Ass'n, Inc. v. Los Angeles Cnty. Sheriff's Dep't, 745 F. Supp. 3d 1037, 1054 (C.D. Cal. 2024), or "up to two to three years," Giambalvo, 155 F.4th at 184. As in both California Rifle and Giambalvo, however, the delays faced by Individual Plaintiffs went "well beyond" the period provided by statute, California Rifle, 745 F. Supp. 3d at 1054; see Giambalvo, 155 F.4th at 184; indeed, the alleged delays here, at minimum, more than doubled the forty-day period provided by Mass. Gen. L. c. 140, § 121F(a), D. 9 at 21-22. Without reaching the question of any bright-line rule about what length of delay constitutes a constitutional violation, see California Rifle, 745 F. Supp. 3d at 1054; Giambalvo, 155 F.4th at 184, the Court concludes that the Individual Plaintiffs

have at least plausibly alleged that the delays they faced, combined with the lack of a grace period for nonresidents, D. 13 at 20, operated to deprive Individual Plaintiffs of their "right to public carry," Bruen, 597 U.S. at 81; cf. United States v. Peterson, 161 F.4th 331, 341 (5th Cir. 2025) ("decid[ing] only that [plaintiff's] unsupported claim that applicants must wait eight months on average before they can obtain a suppressor is insufficient to overcome Bruen's presumption," where plaintiff "cite[d] nothing to support his claim [of] current processing times"), cert. denied, 224 L. Ed. 2d 501 (Apr. 20, 2026).[4] Although a close question, in light of the foregoing, Plaintiffs have plausibly alleged facts that overcome the presumption of constitutionality afforded to Massachusetts' shall-issue regime.

As Defendants fail to raise any historical precedent supporting such delays under the second step of Bruen, id.; see D. 9 at 20-21 (providing historical precedent for in-person interviews), Plaintiffs' as-applied challenge under the Second Amendment survives at this motion to dismiss stage.

*2. Equal Protection Clause*

Plaintiffs also separately allege a violation of the right to travel under the Equal Protection Clause of the Fourteenth Amendment,[5] arguing that lapses in licensure caused by delays in the

---

[4] Discovery may yield further information as to whether the alleged delays reveal a "permitting scheme . . . put toward abusive ends" under Bruen, 597 U.S. 39 n.9. See Marquis, 495 Mass. at 459 (noting that "it goes without saying that a 'shall issue' licensing regime that operated in [an] 'abusive' manner would be the proper subject of an as-applied challenge by persons injured thereby"); see also Giambalvo, 155 F.4th at 183-84 (declining to adopt "bright-line [] time limit" and acknowledging that shall-issue requirements "necessarily require *some* amount of processing time" (emphasis in original)); California Rifle, 745 F. Supp. 3d at 1054 (declining to determine whether delay "crosses the line from acceptable to unreasonable" one day past the statutory assessment period); Guido v. Suffolk County, et al., No. 24-cv-07766-JMW, 2026 WL 2475408, at *20 (E.D.N.Y. Aug. 24, 2026) (discussing Giambalvo and noting that "a delay created by ordinary administrative issues may not constitute a constitutional violation").

[5] "To establish an equal protection violation, a plaintiff must introduce sufficient evidence from which a jury reasonably could conclude that, compared with others similarly situated, the

non-resident LTC process "inhibit[] the free interstate passage of citizens . . . merely on account of their state of residency." D. 1 ¶ 172.

Although "[t]he word 'travel' is not found in the text of the Constitution," the right to travel is "firmly embedded in our jurisprudence[,] such that imposing a penalty on the exercise of the right to travel violates the Equal Protection Clause unless shown to be necessary to promote a *compelling* governmental interest." Marquis, 495 Mass. at 460-61 (internal quotation marks, citation and alteration omitted). The right to travel "contains three basic components: [(1)] the right of a citizen of one State to enter and to leave another State, [(2)] the right to be treated as a welcome visitor rather than unfriendly alien when temporarily present in the second State, and . . . [(3)] for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State." Id. at 461 (internal quotation marks and citation omitted). "A requirement which operates to impose some loss, hardship or disadvantage on the exercise of right to travel may be said to 'penalize' that right. A plaintiff need not show a deterrent effect or intent; it is sufficient that the statute in question operates as a penalty on the exercise of the right." Strong v. Collatos, 450 F. Supp. 1356, 1359-60 (D. Mass. 1978) (internal citation omitted) (providing that "[t]he right of interstate travel is a fundamental right"), aff'd, 593 F.2d 420 (1st Cir. 1979). Prior examples of such penalties include, e.g., "a one-year residency requirement for voting rights," "a one-year residency requirement for free non-emergency medical care for indigents,"' and giving "extra points on the state civil-service exam to resident veterans who had been state residents on the date they entered military service." Westenfelder v. Ferguson, 998 F. Supp. 146, 152 (D.R.I. 1998).

---

plaintiff was treated differently because of an improper consideration." See Hightower, 693 F.3d at 83 n.21 (internal quotation marks and citation omitted).

Defendants first argue that Plaintiffs are merely "repackag[ing]" their Second Amendment arguments in a misguided effort to apply heightened scrutiny. D. 9 at 22-23. While the Court "note[s] that some United States Courts of Appeals evaluating Second Amendment and equal protection challenges to firearm regulations have treated the analysis required by the latter as subsumed under the analysis required by the former, . . . in the interest of completeness, [the Court] conduct[s] a full and separate review of [Plaintiffs'] equal protection claim," Marquis, 495 Mass. at 464 n.17, particularly where Plaintiffs' equal protection claim is asserted "[s]eparately from [their] Second Amendment claim," D. 1 ¶ 169.

Defendants then argue that Plaintiffs' equal protection challenge should not be afforded heightened scrutiny, citing Marquis, which discussed a challenge to the Commonwealth's non-resident LTC regime. D. 9 at 23-24. In Marquis, 495 Mass. at 462-64, the Supreme Judicial Court applied rational basis review where it concluded that the "nonresident firearm licensing scheme neither violates a fundamental right nor relies on a suspect classification." Id. at 463. By contrast, here, the Court has concluded that Plaintiffs have at least plausibly alleged an as-applied Second Amendment challenge. Moreover, unlike in Marquis, therefore, Plaintiffs have "posit[ed] a constitutional dilemma: [they must] either suffer disarmament, arrest and/or prosecution by entering the Commonwealth with an unlicensed firearm or yield Second Amendment rights" when entering same. Cf. id. at 462 (internal quotation marks omitted). Further, while Plaintiffs' claims overlap with those made in Marquis, they differ in that Plaintiffs do not merely challenge a statutory "differential in expected processing times" for nonresidents and residents. Id. at 468-69. Rather, Plaintiffs challenge alleged processing delays that go beyond the timelines provided by statute and that, when coupled with the lack of grace period and other challenged features of the LTC regime, expose nonresidents to criminal penalties during periods of lapse while shielding

residents from same. Cf. id. Accordingly, Plaintiffs allege a distinction in treatment of LTC applicants based on residency. Id. at 462. Taken together, Plaintiffs have adequately alleged that the LTC regime penalizes their right to travel. Cf. id. at 463-64; Hightower, 693 F.3d at 83 (applying rational basis review to equal protection claim, "[g]iven that the Second Amendment challenge fails").

Accepting the plausible allegations as true at this juncture, as it must, the Court considers the application of strict scrutiny. "The formula for strict scrutiny is familiar: the government must demonstrate that its action [1] served a compelling state interest and [2] was narrowly tailored to advance that interest." Bos. Police Superior Officers Fed'n v. City of Bos., 147 F.3d 13, 19 (1st Cir. 1998) (internal quotation marks and citations omitted). "The burden of proving a compelling interest and narrow tailoring rests on the defendant." Comfort ex rel. Neumyer v. Lynn Sch. Comm., 283 F. Supp. 2d 328, 363 (D. Mass. 2003), rev'd sub nom. Comfort v. Lynn Sch. Comm., 03-2415, 2004 WL 2348505 (1st Cir. Oct. 20, 2004), reh'g en banc granted, opinion withdrawn (Nov. 24, 2004), on reh'g en banc, 418 F.3d 1 (1st Cir. 2005), and aff'd sub nom. Comfort v. Lynn Sch. Comm., 418 F.3d 1 (1st Cir. 2005). Here, Defendants provide no argument as to why Plaintiffs' claims fail under strict scrutiny as opposed to rational basis review. D. 9 at 22-24. As to the first, the government interest served by Massachusetts' LTC regime is "promoting public safety and preventing crimes." Ritrovato, 2025 WL 777216, at *5 (internal quotation marks and citation omitted). Such interest "implies a more specific interest . . . in verifying the suitability and prohibition status of nonresidents who seek to publicly carry firearms within [Massachusetts'] borders." Marquis, 495 Mass. at 466. Even assuming *arguendo* that the foregoing constitutes a compelling state interest, Defendants have not squarely addressed how the challenged features of Massachusetts' LTC regime are narrowly tailored to promote that interest, see Ass'n for Educ.

Fairness v. Montgomery Cnty. Bd. of Educ., 560 F. Supp. 3d 929, 956 (D. Md. 2021). In the absence of argument to the contrary, and reading the allegations in the light most favorable to the nonmovant, the Court DENIES the motion as to Count II.

*3. Privileges and Immunities Clause, Art. IV, § 2*

Plaintiffs also advance a claim under the Privileges and Immunities Clause, alleging that Defendants' enforcement of the licensing scheme effectively discriminates against citizens of other states. D. 1 ¶¶178-82. The Privileges and Immunities Clause "protects only those privileges and immunities that are fundamental," A.C. by Waithe v. McKee, 23 F.4th 37, 47 (1st Cir. 2022) (internal quotation marks and citation omitted); see Surprenant v. Massachusetts Tpk. Auth., 09-cv-10428-RGS, 2010 WL 785306, at *7 (D. Mass. Mar. 4, 2010), or, put differently, those activities that are "basic and essential," such that interference with same would "frustrate the purposes of the formation of the Union," Baldwin v. Fish & Game Comm'n of Montana, 436 U.S. 371, 387 (1978). "Only with respect to those 'privileges' and 'immunities' bearing upon the vitality of the Nation as a single entity must the State treat all citizens, resident and nonresident, equally." Id. at 383.

Defendants argue that Plaintiffs' claims are not sufficiently "vital to the preservation of the Union" to violate the Privileges and Immunities Clause, such that Plaintiffs' claims fail as a matter of law. D. 9 at 24-25. While Plaintiffs contend that the Commonwealth's LTC regime constitutes a "scheme in derogation of the constitutional liberties of non-residents, . . . to keep and bear arms in Massachusetts,'" D. 13 at 23, the Court is "unaware of a decision holding that a privilege of citizenship [under Art. IV, § 2] includes a right to engage in the public carry of a firearm, . . . [and] it seems difficult to conclude that such a right, if it exists, is essential to the ongoing vitality of the nation," Culp v. Raoul, 921 F.3d 646, 657 (7th Cir. 2019); cf. Saenz v. Roe, 526 U.S. 489, 501

(1999) (noting that the Privileges and Immunities clause protects "nonresidents who enter a State . . . to obtain employment, to procure medical services, or even to engage in commercial shrimp fishing" (internal citations omitted)). Because Plaintiffs' allegations are not sufficient to state a claim under the Privileges and Immunities Clause, see A.C. by Waithe, 23 F.4th at 47, such claim fails.

## VI. Conclusion

For the foregoing reasons, the Court DENIES the motion, D. 8, under Fed. R. Civ. P 12(b)(1) in its entirety. The Court further DENIES the motion under Fed. R. Civ. P. 12(b)(6) as to Count I insofar as Plaintiff makes an as-applied claim and as to Count II. The Court ALLOWS the motion under Fed. R. Civ. P. 12(b)(6) as to Count I insofar as Plaintiff raises a facial claim and as to Count III.

**So Ordered.**

/s Denise J. Casper
Chief United States District Judge